# EXHIBIT 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| RODNEY HOFFMAN, ON BEHALF | * | |
| OF HIMSELF AND ALL OTHERS | * | |
| SIMILARLY SITUATED, | * | |
| PLAINTIFF | * | |
| v. | * | CA 5:21-CV-423-XR |
| FLUID FLEET SERVICES, LLC, | * | |
| DEFENDANT | * | |

---

ORAL DEPOSITION OF RODNEY HOFFMAN

APPEARING REMOTELY FROM SAN ANTONIO, TEXAS

AUGUST 2, 2022

---

ORAL ANSWERS AND DEPOSITION of the Witness, RODNEY HOFFMAN, who resides in Bexar County, Texas, in answer to questions propounded to him in the above numbered and styled cause, taken remotely by the Defendant before Sherri K. Williamson, a Certified Shorthand Reporter in and for the State of Texas, on the 2nd day of August, A.D. 2022, between the hours of 11:03 A.M. and 2:35 P.M. pursuant to Notice.

It is stipulated and agreed by and between Counsel and the respective parties hereto that the Deposition of the Witness named in the caption hereto may be taken at this time and place, pursuant to the Federal Rules of Civil Procedure, and that the said deposition or any part thereof, when so taken, may be used on the trial of

this case the same as if the Witness were present in court, testifying in person.

* * * * * *

REMOTE APPEARANCES:

Welmaker Law, PLLC
409 N. Fredonia St., Suite 118
Longview, Texas 75601
doug@welmakerlaw.com
BY: DOUGLAS B. WELMAKER,
Appearing for the Plaintiff;

Fox Rothschild LLP
980 Jolly Road, Ste. 110, PO Box 3001
Blue Bell, PA 19422
epage@foxrothschild.com
BY: ERIKA M. PAGE,
Appearing for the Defendant;

RODNEY HOFFMAN,
The Witness; and

SHERRI K. WILLIAMSON,
Certified Shorthand Reporter
in and for the State of Texas

* * * * * *

I N D E X

PAGE

STIPULATIONS....................................1
APPEARANCES.....................................3

EXAMINATION PAGE

RODNEY HOFFMAN

Examination by Ms. Page.........................5, 128

Examination by Mr. Welmaker.....................120

EXHIBITS PAGE

1 Offer Letter..................................96
2 TriNet Earnings Statements....................101
3 All Jobs Completed............................107
4 Hours Worked..................................113
5 OT Hours Since Conversion.....................115
6 Email to HR...................................119

PAGE

SIGNATURE AND CHANGES...........................131
REPORTER'S CERTIFICATE..........................132

-o-O-o-

THE REPORTER: This is the oral deposition of Rodney Hoffman, who is located at 7350 Blazar Way, San Antonio, Texas, and has been identified to me through Texas Driver's License No. 38181814.

My name is Sherri Williamson, Certified Shorthand Reporter No. 5105. I am appearing remotely, by stenographic means, from my home in Kyle, Texas.

Would Counsel please state their appearances and locations for the record?

MR. WELMAKER: Doug Welmaker for Plaintiff, Rodney Hoffman.

MS. PAGE: Erika Page of Fox Rothschild on behalf of Defendant, and I am taking this deposition remotely from Philadelphia, Pennsylvania.

RODNEY HOFFMAN,

having been first duly sworn, testified as follows:

EXAMINATION

Q (BY MS. PAGE) All right. Good morning, Mr. Hoffman. My name's Erika Page, and I represent your former employer, Fluid, in this lawsuit that you filed in Federal Court. Can you just state your full name for the record.

A Yes. Before I do that, ma'am, I'm just going to turn up my volume so I can hear you. One moment.

Q Okay. Yes. And if I -- I'll get to those

instructions, but if you cannot hear me, if you don't understand a question, please feel free to ask me to repeat that.

A Okay. I believe you asked me to state my name for the record. My name is Rodney William Hoffman.

Q Okay. And have you ever given a deposition before, Mr. Hoffman?

A No.

Q Okay. Have you ever testified under oath before for any reason?

A Yes.

Q And what was that for?

A In my best recollection, I worked for the South Dakota Highway Patrol from the years of 2006 to 2010, and I would be called to court for any tickets or infractions that may be needed -- or contested by the defendant, also testifying before any Grand Jury.

Q Okay. And what was that Grand Jury proceeding?

A One of them that I remember was regarding a methamphetamine possession case. A driver entered the port of entry at the South Dakota/Minnesota border, was subjected to a federal inspection, and displayed behavior that was consistent with methamphetamine use, and a drug recognition expert was called out with a dog, and he was subsequently arrested for methamphetamine

possession.

Q Okay. Understood. Ever testified under oath for any other reason?

A I had a bankruptcy case 2010. I do not recall whether or not I was called to testify under oath or whether my lawyer handled that.

Q Okay.

A That is the only other time that I can think of that I would have. In -- in tickets cases in South Dakota Highway Patrol, again, if a ticket was contested, I would be called into court; however, I cannot recall the number of times over four years that that happened.

Q Understood. Understood. And when was -- Was your bankruptcy case resolved?

A Yes.

Q And when was that resolved?

A 2010, March.

Q Okay. Understood. I'm just briefly going to give you the procedure for a deposition. I know you mentioned you've testified under oath many times before but just want to clarify some of the differences with the deposition and just go over a few ground rules.

I'm going to ask you a series of questions. Like the Grand Jury proceedings and other

proceedings in which you testified, you're under the oath to tell the truth. And you understand that even though we're not in a courtroom, your testimony is still the equivalent of a testimony given in a courtroom and, therefore, subject to the penalty of perjury? Do you understand that?

A Yes.

Q Okay. As you can see, Ms. Williamson is here taking down everything that everyone says; therefore, we ask that you verbalize your answers. And although we can all see you nod your head or shrug your shoulders via Zoom, that's really ambiguous and it can't be taken down, so please just speak your answers.

Also, the court reporter can only take down one person speaking at a time; therefore, please just let me finish my question before you answer, even though you may already know the answer, and, again, I'll give you the same courtesy as well. And kind of alluding to what we said to you before, if I don't under- -- if you don't understand any particular question that I ask you or you don't hear me clearly, please let me know, and I'll try to clarify it so that you can understand it before you answer it.

And, again, if you need to take a break at any time, let me know and I'll be happy to accommodate

you. The only thing I ask is that if we're in the middle of a question, that you please just answer that question beforehand.

Do you have any questions for me about this procedure before we get started?

A No.

Q Okay. And are you currently under any medication that may impair your ability to understand my questions today?

A No.

Q Have you ever committed a felony?

A No.

Q And I apologize for that question and this preceding question. It's just part of procedure. Have you ever been convicted of a crime of crimen falsi?

A I didn't understand the last part of what you asked.

Q It's called a crime of crimen falsi, so meaning a crime of lying to law enforcement or a crime of -- involving lying --

A No.

Q -- involving lying or dishonesty.

And just a few background questions, Mr. Hoffman. What's your date of birth?

A September 12th, 1964.

Q Okay. And are you married?
A I am.
Q And were you married when you worked at Fluid?
A Yes.
Q Okay. And what date were you married?
A January 5th, 1985.
Q Okay. Wonderful. Had you been married before your current partner?
A I was 17 -- or I was 19 years old before her, so, no, I was not.
Q And what is her name?
A Lisa.
Q Lisa? Lisa Hoffman?
A Lisa Hoffman. Sorry.
Q Okay. Yes. And do you and Lisa have any children?
A Yes.
Q Okay. And what are their names and ages?
A William was born August 5th, 1985, and Adam was born -- oh, William Hoffman. I'm sorry. And Christopher Hoffman. His middle name is Adam. We call him Adam. He was born December 28th, 1986. I'll let you do the math.
Q Okay. Do your children currently live with you?

A No.
Q Okay. And what is your current address?
A 7350 Blazar -- that's B, as in boy, L-A-Z-A-R -- Way, San Antonio, Texas 78252.
Q And how long have you lived at that address, Mr. Hoffman?
A Since June, the middle of June 2014.
Q Okay. And where did you live prior to that?
A Prior to that, we lived in an apartment complex in San Antonio, on Culebra Street. I'm not quite sure anymore of the address. It was a temporary residence when we moved to San Antonio, before we got the house.
Q Okay. Understood. And how long did you live at that apartment complex?
A From February of 2014 until June of 2014.
Q And where did you live prior to that?
A Prior to that, we lived in South Carolina, in Little River, South Carolina.
Q Okay. And what was your address in Little River?
A Without looking specifically at the addresses, I couldn't be sure. We lived there for a period of time from May of 2010 to February of 2014.
Q Okay. And please just take me through your educational background, beginning with your high school.

A When I was 17 years old, I was in 12th grade. I signed up for the military and went into the military at 17 years old. After Basic -- That was 1982. After Basic Training, I was stationed in Germany. I received my general education diploma in Germany in 1982.
Q Okay. And what was the name of that high school you attended prior to serving in the military?
A I was a military brat, so I actually attended several high schools. The first high school I attended was Hueneme High School in Port Hueneme, California. The next high school that I attended was Castlewood High School in Castlewood, South Dakota. The next high school that I attended was Iroquois High School in Iroquois, South Dakota. The next school that I attended was Penn High School in Indiana. The next school that I attended was Huron Senior High School in Huron, South Dakota. From there is where I enlisted into the military.
Q Okay. Wonderful. And thank you very much for your service.
A Thank you.
Q After the military, were you honorably discharged or how long did you continue to serve?
A I served in the military until July 7th of 1987, with an honorable discharge.

Q Okay. And following that, did you attend college at all?

A I actually began working straight out of the military. I did attend college. Again, I'd have to look at my transcripts, but not until, I believe, 2000 or 2001, where I attended college -- or, excuse me -- technical college until 2003 or 2004. Again, I would have to look at my transcripts. I can't recall those dates offhand.

Q Quite all right. Can you recall the name of the technical college you attended?

A It was Southeast Technical Institute, and it was in Sioux Falls, South Dakota.

Q Okay. And did you graduate from Southeast Technical Institute?

A No.

Q Okay. Any reason why you did not graduate?

A I suffered a neck injury in December of the last year, when I had to leave school because I could not keep up with studies and have the surgery required to repair that neck injury.

Q Understood. What were you studying there?

A Cardiovas- -- Excuse me. Invasive cardiovascular technician.

Q Oh, very cool. Had you attended any other

trade schools?
A No.
Q Any other educational certificates?
A I'm not sure I understand your question. I may explain, if I can.
Q Sure.
A Several times during especially my career at the Highway Patrol, of course, you're always receiving further education from seminars and those types of things, and you'll receive certificates, but they're not in a school setting.
Q Okay. Understood. And to become a member of the Highway Patrol, was that considered the police force or was that something separate?
A My job with the Highway Patrol was as a commercial motor-vehicle inspector; therefore, I was -- I was -- I had arrest powers but only as they relate to commercial motor-vehicle enforcement. As I stated before -- I stated to you about the methamphetamine possession. That's why I needed to call a drug recognition expert out to inquire about that, because if that person had been under the influence, I could not have done anything about it. I did not have those arrest powers.
Q Okay. Understood. Understood. I just want to

ask you a little bit about your work history. So following your discharge from the military, where did you begin working?

A The first place that I worked when I left the military was a company called Vereen's Construction. This was in North Myrtle Beach, South Carolina. I was a dump truck driver and general laborer.

Q Okay. And how long did you work for that company, Mr. Hoffman?

A I cannot accurately reflect anything except an estimate. I believe six months.

Q And where did you work at after Vereen's Construction?

A I worked part-time during my work with Vereen's Construction as a driver for Domino's Pizza.

Q Okay.

A And after I left Vereen's Construction, I worked for Domino's Pizza for a period of years. I worked as a driver, an assistant manager, and also managed some stores for Domino's Pizza.

Q Okay. And how long, approximately, did you work for Domino's Pizza?

A Probably -- I believe, to my best recollection, till 1991.

Q Okay. Okay. And where did you work following

Domino's?
A When I left Domino's Pizza, I was a store manager in Charlotte, North Carolina. I was living in Gastonia, North Carolina, and I received a position as an account manager with a company called Rent-A-Center, Rent dash A dash Center.
Q Okay. And how long were you working for Rent-A-Center?
A As with Domino's Pizza, I worked my way up from an account manager to a manager. I was on -- The best way to describe it is, is wherever they needed me, I worked. If stores were in trouble, I put the fires out and managed them. My last place of employment with Rent-A-Center was in Sioux Falls, South Dakota, in 1996, I believe.
Q Okay. Okay. And what about -- And I apologize for this being repetitive. What about after Rent-A-Center?
A I was in Sioux Falls, South Dakota. When I left Rent-A-Center, I took a position with a company called Pacesetter Home Improvements. They were out of Omaha, Nebraska.
Q And how long did you work for Pacesetter?
A Once again, I started out as a sales representative with Pacesetter and worked my way up to

Store Manager, a Sales Manager. I believe that I left Pacesetter around 1999 or 2000.

Q Okay. And what about after Pacesetter? Or -- yes. What about after Pacesetter Home Improvements?

A After Pacesetter, I took a short-term assignment with a company called National Write Your Congressman out of Dallas, Texas.

THE REPORTER: Say it again.

THE WITNESS: I took a short-term position with a company called National Write Your Congressman out of Dallas, Texas. I was a field representative for them in Sioux Falls, South Dakota.

Q (BY MS. PAGE) And how long was that short-term assignment?

A Six months.

Q Okay. And what about after that assignment?

A I was hired at Citibank in Sioux Falls, South Dakota, as a customer service representative.

Q And how long did you work at Citibank?

A I know that I was going to school while I was working at Citibank, working Citibank second shift and school first shift --

Q Okay.

A -- I believe to 2005.

Q Okay. And what about after Citi?

A In 2005, I interviewed with the Highway Patrol --
Q Okay.
A -- and the position was an open position. They had a closing date of -- I believe it was three or four months. I don't recall. They didn't tell me whether I was hired right away. Again, I took another short-term position just as a delivery person with a local laundry in Sioux Falls called Shipley's Laundry, and I loved that job.
Anyway, I took that position and then the Highway Patrol called me up out of the blue and said, "You're coming on," and so in 2006 is when I started with the Highway Patrol.
Q Okay. And how long were you with the Highway Patrol?
A Until April of 2010.
Q Okay. And what about after the Highway Patrol?
A In April of 2010, my wife's mother became ill. She lived in South Carolina. We went back to take care of her. I resigned my position. We moved to South Carolina. In July of 2010, I was hired with a company called Home Depot Measure Services as a measure technician. I maintained that job until my mother-in-law passed away, and my mother-in-law passed

away, I believe, November of 2013. We had to get her affairs in order.

Q Okay. I'm sorry to hear that. What about after Home Depot?

A After Home Depot Measure Services, we got her affairs in order. I made an advance trip out here. February of 2014 is when we moved out here. In February -- In March of 2014, I got a job as a DOT Safety Inspector for Circle Bar A, Inc., in Pleasanton, Texas. It was a trucking company servicing the oil field.

Q Okay. And how long did you work for them?

A For them I worked from March of 2014 to August of 2019.

Q And then what did you do after that, Mr. Hoffman?

A In August of 2019, I went to work for a local school here that was starting a truck-driving class as their CDL Class A Licensing and Admissions Representative. The school name was South Texas Vo-Tech.

Q Okay. And do you have your CDL, Mr. Hoffman?

A I do not.

Q Okay. And what did you teach there?

A I did not teach. I was a Licensing and

Admissions Representative, meaning that I made sure that the students both would be able to come on to the school and get -- were certified that they would be able to get their medical card, drug testing, and licensing.

Q Okay. And how long did you work there?

A Until COVID hit, roughly -- I believe my last -- Actually, it was a little before COVID hit, January of 2020.

Q Okay. Okay. And then what was your next position?

A Fluid Truck Share.

Q Okay.

THE REPORTER: Fluid Truck -- Say it again.

THE WITNESS: My next position was Fluid, F, as in Frank, L-U-I-D, Truck Share, the company we're currently here about.

Q (BY MS. PAGE) Okay. And how long did you work at Fluid?

A From February of 2020 to October 31st of 2021.

Q Okay. And where did you work after Fluid?

A On December 6th of 2021, I was hired as a lead loader for Carvana, LLC, out of Arizona, but I was working in San Antonio.

Q Okay. And is that your current employer?

A That was my current employer until this month. Carvana has suffered some significant financial setbacks and has reduced their workforce.
Q Okay. So were you let go as a result of reduction in workforce?
A My hours were reduced to the point that I had to look for more employment.
Q Okay. And are you currently employed now?
A Beginning tomorrow.
Q Oh, okay. And where are you work -- Where will you begin work?
A I will be working for VIA Bus Service in the City of San Antonio.
Q Okay. And apart from Fluid, have you ever filed a lawsuit against any of the employers that you just mentioned?
A No.
Q Okay. Have you ever made a complaint to the EEOC about any of these employers?
A I -- Did you say "EOC"?
Q EEOC, the Equal Employment Opportunity Commission.
A No.
Q Okay. Ever make any complaints to a State agency about any of these employers?

A No.
Q Okay. Just kind of working backwards, at VIA Bus Services, will you be paid a salary or hourly?
A Hourly.
Q Okay. And are you expected to receive overtime pay?
A I do not know.
Q Okay. And what will your hourly rate be?
A $20.25 an hour.
Q Okay. And then at Carvana, were you salary or hourly?
A Hourly.
Q And what was your hourly rate there?
A $23 an hour.
Q And at Carvana, did you ever receive overtime work?
A To the best of my knowledge, yes.
Q Okay. And what was your overtime rate, if you remember?
A Time and a half.
Q Okay. And how often did you get over time?
A I worked there a short time. I would -- To my recollection, maybe two weeks out of the entire time I worked there. They were very specific about their time.
Q Okay. What about your position as a -- as a

licensing coordinator at the technical school?
A The hours?
Q Hourly or salary at the technical school?
A The hourly rate was $23 an hour, to the best of my recollection, and it was hourly.
Q Okay. And any overtime there?
A No.
Q Okay. What about as the DOT Inspector at Circle Bar A, Inc.?
A Because I had oversight of all the drivers and could be called in on any basis, that company decided that I would be salary.
Q Okay. And what was your salary, if you could recall?
A I was five years with them and my salary actually went up and down. I started out at 750 a week. I was as high as 1100 a week. Because the oil field goes up and down, so does your salary if you want to stay on, so -- My highest would have been 1100 a week. My lowest would have been 750.
Q Okay. And how many hours per week, approximately, did you work?
A The company was open seven days a week, 24 hours a day. My job required me to not only do anything with federal but also with safety. So my

normal working hours were Monday through Friday, 8:00 to 5:00, with an hour lunch; however, in any given week or time, that could all change, depending on if we had an accident or safety -- something on the well went wrong, and that -- I wore -- basically, had a phone on my hip that was my Siamese twin, I tell people, on my hip for 24 hours a day. Whenever it rang, I ran.

Q Okay. And if you were required to kind of run to these emergencies, were you ever compensated for that?

A I'm not quite sure what you mean by "compensation" as I may have been compensated for fuel.

Q Okay. But did you receive any sort of bonus, any sort of time-and-a-half pay, anything like that?

A No.

Q Okay. Understood. What about at Home Depot? Hourly or salary?

A Home Depot Measure Services was piecework.

Q Okay. And was that -- How many hours did you work per week there?

A I worked by the piece. I worked as a measure tech. If somebody had an order in for Home Depot for flooring, wall treatments, roofing, decks, anything that needed to be measured in the home, I was the advanced person. I got paid $30 per measure.

Q Okay. And I just want to do one more that takes us back past ten years. What about when you worked on the Highway Patrol, for the South Dakota Highway Patrol?

A The South Dakota Highway Patrol, my schedule was hour -- excuse me -- I was on a yearly salary. I worked eight hours a day, per my schedule, five days in any week. The schedules were rotating, and if we wanted overtime, it would only be something like a federal grant might come down from DOT that we need to do more certain types of inspections on trucks or something like that, and then you could apply for overtime but had to receive permission before you could do it.

Q Okay. And, normally, you would work 40 hours per week?

A Yes, normally.

Q Okay. And what was your salary there, if you can recall?

A I -- Did you say "salary"?

Q Your yearly salary, yes.

A I'm trying to work it backwards from weeks.

Q That's fine.

A Then I'm trying to think about my deductions. I would say it was probably somewhere in the 35- to 40,000-a-year range, and I don't -- I don't know an

exact figure.
Q Okay. And how often did you work overtime, if you can recall?
A I can't recall.
Q Okay. Thank you for bearing with me with all that. And with each of your employers, did you have any other wages -- did you have any other wage issues with any of your employers?
A No.
Q No? Is that correct? No issues with your wages prior to Fluid?
A Other than with Fluid, no.
Q Okay. Okay. And other than your 2010 bankruptcy, have you ever filed any other bankruptcy claims?
A It -- I had another bankruptcy. It would -- Again, without getting anything out -- I had another bankruptcy. I don't recall when it was. Several years prior to that.
Q It was several years prior to 2010?
A Yes.
Q Okay. Understood. And the 2010 case, where was that filed?
A South Dakota, Sioux Falls.
Q And what about the previous case, if you can

recall?
A Also in South Dakota, Sioux Falls.
Q Okay. And did that case resolve?
A That case was also resolved.
Q Okay. And we went through this. Just going through my notes. Your benefits when you were working with Carvana, in addition to your salary, did you receive any other benefits, such as health insurance?
A Yes.
Q Okay. And in addition to health insurance, did you receive dental insurance?
A Yes.
Q Vision insurance?
A Yes.
Q Life insurance?
A Yes. However, I may ask when -- may add that when you said "received," I had to pay for this, also.
Q Okay. Understood. Understood. Did you ever receive a bonus during your time at Carvana?
A No.
Q PTO?
A Vacation? Paid time off --
Q Yes.
A -- yes, was a benefit.
Q Okay. And did you ever receive retirement

benefits at Carvana?
A Retirement benefits were available. I was not -- did not partake in them.
Q Okay. Understood. And approximately, and a ballpark is fine, how much did you pay for your health, dental, and vision and life insurance, in total, at Carvana per month?
A I need clarification as my wife was also on my insurance.
Q How much did you pay for you and your wife in total?
A $283 per paycheck.
Q Okay. And at Fluid, did you receive health insurance?
A Yes.
Q Or pay into it, rather. What about dental insurance?
A Yes.
Q Okay. Vision insurance?
A I can't be sure.
Q Okay. And life insurance?
A To the best of my recollection, I had life insurance.
Q Okay. And was your wife on each of your insurance plans as well?

A I believe that my wife was on everything except for the health insurance.
Q Okay. And how much did you pay per month for your insurance?
A I don't recall.
Q Did you receive retirement benefits at Fluid?
A Did you say "retirement benefits" or "time and benefits"?
Q Retirement benefits. I apologize.
A I re- -- I'm unsure how to answer your question as Fluid provided stock options, and I'm unsure whether those could be considered retirement benefits.
Q Okay. Any other type retirement benefits that you recall?
A Not that I recall.
Q Any bonuses you received at Fluid?
A Yes. I received -- If my KPIs were met, I received a $500 monthly bonus.
Q Okay. And did you receive PTO time at Fluid?
A Yes.
Q Okay. And how often would you receive this monthly bonus of 500? Was it a regular occurrence or did you just occasionally receive it?
A It was monthly.
Q Okay. So you got an additional $500 bonus each

month in addition to your regular wages?
A That's correct.
Q Okay. What about PTO time at Fluid?
A Before we go further, there was a period at the end of my employment with Fluid, the last couple months, that I did not receive an entire bonus.
Q Okay. And why was that?
A They changed the KPIs to include items on the KPIs that we could not meet.
Q Okay. And do you remember what month they changed that in?
A I believe the month beginning was September 2021.
Q And do you know why they changed that?
A No.
Q And I'm sorry. Just to clarify for the record, did you receive paid time off at Fluid?
A If you're asking did I receive paid time off when I put in for it, yes.
Q Yes. So that was a benefit you had?
A Yes.
Q How many days per year were you entitled to receive paid time off?
A Two weeks.
Q Okay. Mr. Hoffman, sorry if I'm repeating

questions, but other than the times we mentioned, were you ever unemployed?
A When you say "other than the times we mentioned," do you mean in my entire 50-year career?
Q Yes, that is correct.
A I don't recall.
Q Okay. Have you ever during your career filed for unemployment benefits?
A No.
Q Okay. Is there a reason for that?
A I guess my mother and father raised me right. If you don't work, you don't eat.
Q Okay. Understood. Just wanted to switch some -- a few gears a bit. I wanted to talk about the onboarding process at Fluid. How did you first hear about the open position there?
A Through an ad on indeed.com.
Q Okay. And then did you ever complete a job application for Fluid?
A Yes.
Q Okay. And can you recall what position you applied for?
A Automotive Dry-Tech was the position in the ad.
Q Okay. And you mentioned that the application said you would be an Automotive Dry-Tech. Did the job

application say what your salary would be?
A I believe it gave a range.
Q And can you recall the range?
A No.
Q Did it indicate whether you would be paid yearly or hourly?
A The ad indicated salary range.
Q It indicated salary range?
A Correct.
Q Okay. Did it indicate whether you would be an FLSA exempt or non-exempt employee?
A To my recollection, I did not read any of that in the ad on indeed.com.
Q Okay. And when it indicated your yearly salary range, did you understand what this meant?
A That it would be a salary paid to me that would total in one year that amount. That's what I understood.
Q Okay. When were you hired by Fluid?
A I don't recall my hire date. My first day on the job was February 17th of 2020.
Q Okay. Was there an interview for the position at Fluid?
A Yes.
Q Okay. And where did that occur?

A The interview -- The initial interview was by telephone.
Q Okay. And then was there a follow-up interview after that?
A I had another follow-up interview by telephone with another person, yes.
Q Okay. And when did those interviews occur, if you can recall?
A At some point in early February.
Q And that's early February of 2020; correct?
A That's correct.
Q Okay. And who did you speak with on the phone, if you can recall? Who did you speak with on the phone at Fluid during the interviews, if you recall?
A I do not recall either person's name.
Q Okay. And there were only two people on those calls? Let me rephrase. You only spoke with two individuals; is that accurate?
A Yes. I spoke with two individuals.
Q Okay. Understood. After they offered you the position, did you have any other communications with anyone else at Fluid about the position?
A When I was actually hired, I had a communication with somebody. I also had a communication with a person who set up my travel arrangements to go to

Denver and also set up the hotel arrangements and all of that, but that would have been after I was hired.

Q Okay. During your interview, did anyone tell you what your salary would be?

A I was given the salary range during my interview. The salary was negotiated after the interview.

Q Okay. And what was the salary you negotiated?

A 45,000 per year.

Q Okay. And did you understand at that point that that was a yearly salary?

A I understood that that is what I would make per year as part of my job.

Q Did you --

A However --

Q Yes, continue.

A -- as part of those negotiations, the bonus per month was also discussed, as well as stock options.

Q Okay. And that bonus was 500 per month?

A If KPIs were met.

Q Okay. And were there any requirements that you negotiated in order to receive stock options?

A No, I did not negotiate stock options. I took what they offered.

Q And during that time, did you -- did you

understand that you would not be eligible for overtime?
A I don't recall at any point in time that was ever discussed.
Q But what did you understand about overtime?
A I would need clarification if you're meaning at the interview.
Q This was when you were offered the position.
A Overtime was not discussed.
Q Okay. Did you have any questions about overtime?
A No.
Q What was your understanding about whether you would be paid for overtime or not?
A Again, regarding overtime, specifically, it was not discussed during the negotiation.
Q Okay. But let me ask you -- I understand that it wasn't discussed. Let me rephrase. If you were working over 40 hours, did you have an understanding that your pay would change at all?
A Are we still speaking about the salary negotiations?
Q Yes.
A Again, I had no -- I -- At the time of the salary negotiation, it was understood that my salary was $45,000 per year. If I may add that I believe during

the salary negotiation or at some point before my first day on the job, I was told that regardless of what I did for Fluid, that I would be paid at 40 hours a week.
Q Okay. And did you have any questions about that?
A Not at that time, no.
Q Okay. You just were okay with what Fluid told you?
A At that time, yes.
Q Okay. And why was that?
A Because we had a great interview and salary negotiation. I understood then that they were to be a start-up company and that at the time that I was hired, we didn't even have a market yet in San Antonio. We had no idea what we were doing.
Q Okay. Understood. At the point following your salary negotiation, were you given any paperwork?
A Yes.
Q What were you given?
A An offer letter.
Q Okay. Anything else?
A Referring to like a W-4 that I filled out or something when I was hired?
Q Any paperwork that you received after your hire at Fluid.

A I recall receiving an employment letter. I re- --
Q Is the employment letter the same as the offer letter?
A Yes, one and the same.
Q Okay.
A I also recall receiving a plane ticket confirmation as well as an email. I recall receiving an email regarding hotel expenses and how those would -- that those would be taken care of by the company. And then I recall my employment paperwork was done on my first day out at Denver, which was February 17th.
Q Okay. And this plane ticket was confirming that Fluid was paying for your travel to Denver?
A Yes. They paid for the plane ticket.
Q Okay. And why were you required to travel to Denver?
A They took me to Denver to train for one week.
Q Okay. Understood. Did you receive any certificates as a result of that training?
A No.
Q Okay. After you were hired, did anyone tell you what your job title would be at Fluid?
A During the time of my training, they used the term "Lieutenant."

Q Okay.

A I understand that Lieutenant, from my discussions with them, was Automotive Dry-Tech or Lieutenant. I understood that the position was Lieutenant at that time.

Q Okay. Did your job title ever change?

A At some point in late November of 2020, they referred -- they changed my job title to Senior Lieutenant.

Q Okay.

A And at some point, I believe, in February of 2021 or late January, they changed my job title back to just Lieutenant.

Q Was there any reason why your job title was originally changed to Senior Lieutenant?

A In answer to your question, yes, there was a reason, but I did not find out until after they had changed my job title, when I questioned it.

Q Okay. And what was that reason?

A That I was going to be promoted to start to guide in new Lieutenants who come into the company, to be on call for them, to answer any questions they may have and to help them out.

Q Okay. And why was it eventually changed back to Lieutenant?

A Because I requested it.
Q Why did you request that?
A The reason for my pause is that I have to return to the prior question. I was made a Senior Lieutenant -- I was given that title without my permission.
Q Understood.
A And, therefore, after trying it out a little bit for a couple of months and finding out it was really no different, except I was receiving more and more phone calls from other Lieutenants, I went with my Fleet Manager and asked him that -- "I have enough on my plate running my market. I don't need this, also."
Q Understood. And was your salary -- Did your salary increase while you were a Senior Lieutenant?
A Yes, it did, and that's how I found out they had promoted me.
Q Okay. And what did your salary increase to?
A Without referencing my check stubs, I can't tell you the exact amount. I believe it was a nominal amount of somewhere in the dollar to a half range an hour.
Q Okay. Understood. And once you asked for the regular Lieutenant position back, did your salary then decrease by a nominal amount?

A By the same amount, yes, back to my original salary.
Q Okay. And before you were hired, did anyone ever tell you about your duties as a Lieutenant at Fluid?
A Yes.
Q Who told you those duties?
A The interviewer that I interviewed with, my Fleet Manager or Fleet Supervisor, depending on what position it was back then, who was named Jen Gray, Jennifer Gray. She's from Denver. My Sales Manager, Erin Baker. He's also in San Antonio, or was. He was actually terminated, so he's no longer with us -- or with Fluid. My trainer, Luis, was a Lieutenant in Denver. Leo and Jimmy Eberhard, who is the owner.
Q Okay. And just to clarify, Leo is Leo Amigoni?
A Yes.
Q Okay. And what were those specific duties day-to-day?
A The duties included vehicle monthly inspections, transporting vehicles, servicing vehicles, setting up services for things that I could not do in the field, installing -- or ensuring that the vehicles had telematics and lettering installed, making sure that plates were kept up-to-date and registration and in- --

and insurance, and looking for vendors who may be able to do things I can't do. And there may be other duties, but those are the main ones that I remember at that time.
Q Understood. Throughout the course of your employment at Fluid, did those duties ever change?
A Yes.
Q Okay. And when did those duties change? And let's say -- We'll exclude the part -- your brief tenure as a Senior Lieutenant. Other than that, did they ever change?
A Yes.
Q Okay. And when did they change?
A In approximately mid September of 2020, they brought the telematics installation in-house and made it a requirement that all of the Lieutenants learn to do and install telematics.
Q Any -- anything else? Any other changes in the requirements?
A In sometime June or July of 2020, they brought the lettering for the vans in-house, where the Lieutenants had to do it. Prior to, those two things, the lettering and telematics, were done by outside vendors at San Antonio.
Q Okay. Understood. And did your pay structure

ever change during your time at Fluid?
A Again, when I was promoted to Senior Lieutenant and then back to Lieutenant.
Q Okay. Did your pay ever change from a yearly salary to hourly pay during your time at Fluid?
A Yes.
Q Okay. And when was that?
A A meeting was held March 3rd of 2021 with Leo, Jen Gray, J.D. Spiller, and several Lieutenants from across the country. Leo informed us that our pay would become hourly and that we would be punching a clock to clock in and clock out immediately, and that clock would be done on Zoho, which is a business application that the company uses.
Q Okay. And prior to this, were you ever required to clock in and clock out?
A No.
Q Were you ever required to log the hours for any jobs you performed?
A No.
Q So prior to this change, if you were given a specific job, there was no way you could record your hours?
A I would need clarification on the question.
Q Sure. So prior to this change, did you log the

jobs you performed each day?
A I would ask for clarification on what jobs.
Q Okay. So prior to this change, you didn't clock in and clock out at the beginning of the day; is that correct?
A Correct. And also at the end of the day. There was no time clock.
Q Okay. Understood. So prior to this, even though you did not clock in at the beginning of the day or clock out at the end of the day, were you required to log the jobs you performed?
A The best answer that I can give you in response to your question is there were some jobs that were done through a form in Zoho, the business app. There were some jobs that were not done in Zoho at all that I still had to complete.
Q Okay. And what jobs were included in Zoho?
A Did you say "were" or "weren't"?
Q What jobs were included in Zoho?
A Zoho was a business application that was constantly improved based upon feedback during my entire time with them, so the basic jobs, inspection forms, issue forms, service forms, onboarding forms, telematic forms, license plate forms. Up to a point, expenses were entered in Zoho. Key inventory forms. And I'll

suffer if I can't remember all of them. I -- I've been out of this for 16 months, using Zoho, but I believe that those were some of them.

Q Okay. Understood. And you were required to log each of those jobs you performed in Zoho; is that correct?

A And your terminology of "log," I would use "form."

Q Okay. And can you describe to me what using "form" is?

A That would mean that I would sign into the Zoho, complete the form for whatever job was required, and however long it took to complete that form, that's how long it took.

Q Okay. So your hours for each job were included within the Zoho form?

MR. WELMAKER: Objection; form.

You can go ahead and answer anytime I object, unless it's attorney-client.

THE WITNESS: Oh. I can't accurately answer that question as there were jobs that I could have performed without ever opening the form, and then at the end of the job or at some point later in the day, I would open the form to fill it out.

Q (BY MS. PAGE) And when you filled out those

forms -- regardless of when you were able to open the form, when you filled it out, you recorded your hours per job?

A I did not record anything. There was a time stamp.

Q Okay. Understood. So time was recorded?

A The time stamp, yes, of whenever I filled that form out was recorded on Zoho, absolutely.

Q Okay. Okay. Understood. And what kind of jobs were not included in the Zoho tracking system?

A From a period of when I was hired until sometime in probably April or May of 2021, when we would transfer vans between locations, there was nothing in Zoho to fill out.

Q Okay. And describe what it means by transferring vans between locations.

A Okay. For example, when we would onboard a van to get it ready for rental, it may be located at a location or a parking lot or a dealership or a vacant lot or -- or the shop that we had in San Antonio, and we would complete the onboarding form. And then the Sales Manager, after completion of that, where he could see it was onboarded, would call and say, "I need that particular van to be moved to Buda, Texas, so that the renter can pick it up."

So I would move that van. Or sometimes it was several vans. Sometimes we would onboard several at a time and then the Sales Manager would say, "I need that particular van moved to Austin," or North San Antonio or wherever it was, and then we would go and move them.

Q Okay. And about how often did you perform these moving activities?

A Moves were a requirement of the job, so they were -- they could be daily or just -- it was all dependent upon the needs of the company.

Q Okay. I'm asking -- I know it fluctuated, but, on average, how often were you required, in a regular week, to perform these moving procedures?

A I can't give you an exact day. I would say that it was a requirement of my job to do. Sometimes it would be every day. Sometimes it would be twice a week. Sometimes it could be monthly. I don't recall ever a month that I didn't move vans.

Q Let me ask this: Can you give me a range -- You worked at Fluid for not quite two years; correct? Between a year and a half and two years?

A I worked at Fluid from February 17th, 2020, to October 31st of 2021.

Q Okay.

A So a little bit over a year and a half.
Q Okay. So in that period, can you estimate how many times you were required to move a vehicle?
A Hundreds.
Q Okay. And how many hours did you work per week during that time you were salaried?
A I cannot give you an exact answer to your question.
Q Can you estimate the hours?
A In preparing for this situation that we're in now, I would estimate -- I had to estimate or give some sort of summation, I would say I worked 60, 65 hours a week, dependent upon what needed to be done. Sometimes more, sometimes less.
Q And can you estimate how often this was less?
A How often I would do that?
Q How often would you do that? Yes.
A I worked whatever was needed for the company until March 17th, 2021.
Q Okay. But prior to March 17th, 2021, you can't estimate -- even provide an approximate number of how many weeks you were required to work over 40?
A If you'll excuse me, I believe that I just did provide you an approximate number.
Q You said that -- I understand that you did, you

know, sometimes work 60 to 65 hours per week. My question is, if you are able to, can you estimate how many weeks you were required to do that?
A Because of the way that the San Antonio market worked, it was assumed that I would work whenever it was required at whatever time, day or night, on whatever day. So I would say that, in my best estimation, there was never a week that I did not go out at some point in time beyond what the company re- -- or beyond what was normal was probably every week.
Q Okay. And what was normal to you?
A Well, when I say "beyond what is normal," we need to refer back to what we discussed with the Zoho, the application. Zoho covered some things, but Zoho did not cover everything that I did. And so we started with delivering vans, for example; however, I also did all service calls for the company. I did -- Until we got a tire vendor, I did all tire changes. Until we got an oil change vendor, I did all oil changes.
And my phone was freely given to every single renter that asked for it or that needed it to call me for whatever things that they needed at any time, day, nights, or weekends.
Q Okay. I understood, you know, you worked very hard for the company and made yourself available, but my

question still is: Approximately how many weeks in that little over a year where you were a salaried employee can you estimate that you worked over 40 hours per week?

A In the time before March 17th of 2021, my estimate would be somewhere between 40 and 45 weeks.

Q 40 and 45 weeks. And how many hours per week?

A Again, I can't give you any better answer than I gave you regarding my -- If a week required 52 hours, it was 52. If it required 70, it was 70. If it required more, it was more. If it required less, it was less. Whatever it was that was required, I did it. I can't give you any better estimate than that.

Q Okay.

MR. WELMAKER: I -- Erika, if you'll let me, I may be able to clarify this.

Rodney, just -- I think what she's asking is: On average, how many hours during these 40 to 45 weeks did you work?

THE WITNESS: I would say 60 to 65 hours a week.

Q (BY MS. PAGE) So it's your testimony that you believe you worked 60 to 65 hours per week for each of these 40 to 45 weeks?

A Yes.

Q Do you have any documentation of that?

A No.

Q What do you base your estimate on?

A I base my estimate upon the hours that I actually could recall each day the types of job that I did to arrive at that figure.

Q Okay. And did you ever record this on your own?

A No. If I started at -- reviewing emails at 4:30 in the morning, I didn't record anything to say, "At 4:30 in the morning, I started reviewing emails," no.

Q Okay. So no documentation, just your recollection?

A In terms of, again, outside of the time stamps in Zoho that we already discussed, that's it.

Q Okay. Understood. Just reviewing my notes briefly. Before you were hired -- Hold on just a second. Strike that.

A May I -- May I ask briefly -- In response to clarification, we were discussing things outside of Zoho that I performed, and I'm not sure if your question was an open-ended question or were you just asking me an example of one thing outside of Zoho that I performed?

Q No. It was an open-ended question. I think I understand. Thank you.

A Will you please read that question back?
Q So your attorney clarified it for you. You mentioned that there was about 40 to 45 weeks in which you worked overtime, based on those jobs that were not recorded in Zoho, and you estimated it to be 60 to 65 hours per week.
A Yes. I think I'm asking before -- when my attorney interrupted, the question that you asked -- I'm trying to understand and clarify the question that you asked.
Q He clarified it.
A You asked me: Out -- Is anything that I did in my job -- something to the effect outside of Zoho? I need -- I don't understand that question, if it was anything as an example, or did you want me to list all the things that I did out of Zoho?
Q Anything -- The example that you listed was great. Thank you.
A Thank you.
Q Okay. And just in terms of Zoho, did you use Zoho every day?
A I used Zoho as a normal course of my day, yes.
Q Okay. And when you began a task for the day, was it your normal course to log into Zoho?
A No.

Q Okay. And why was that?
A Until March 17th -- or excuse me. Until March 3rd of 2021, there was no log-in to do that. You simply opened Zoho whenever you had to fill out a form.
Q Okay. Would you normally open Zoho at the beginning of the day?
A No. To my recollection, not necessarily.
Q Okay. Were there any instances where you would open Zoho at the beginning of the day?
A If I needed to review something in Zoho, I would open Zoho.
Q Okay. Understood. During -- Before you changed over to be an hourly employee, did Fluid otherwise -- to your knowledge, did they otherwise document the hours that you worked?
A Not to my knowledge.
Q Okay. All right. Just speaking a little bit more about the pay structure here, did -- you mentioned that the -- your pay structure in March of 2021 changed from -- you became an exempt employee and you were previously not -- or you became a non-exempt employee and you were previously an exempt employee; is that correct?
MR. WELMAKER: Objection; form.
THE WITNESS: I can't answer your question

because this is the first time I've ever heard you refer to "exempt" or "non-exempt."

Q (BY MS. PAGE) Okay. I'll represent to you that "exempt" means that you are a salaried employee, and "non-exempt" means that you were an hourly employee.

MR. WELMAKER: Objection. That misstates the law.

You can answer if you know the answer.

THE WITNESS: I can't answer because I don't still know quite what she's talking about.

Q (BY MS. PAGE) Okay. I'll represent to you -- I'll ask it this way: In March of 2021, you became an hourly employee; correct?

A In March of 2021, I was required to start logging my actual punch-in time and punch-out time, and I was informed that all Lieutenants would be moving to hourly, with a clock to punch in and punch out, yes.

Q So you were an hourly employee, was my question, at that point?

A Okay.

Q Is that a "yes"? You became an hourly employee at that point?

A Yes, on March 3rd.

Q Okay. And prior to March 3rd, you were a salaried employee; is that correct?

A I was paid a salary, yes.
Q And your testimony was that at that point you were not required to clock in and clock out?
A Referring to the time before March 3rd, 2021, yes, I was not required to punch in or punch out.
Q And when did you begin receiving an -- When did you begin receiving an hourly wage?
A My first hourly paycheck was for the two-week period beginning March 17th. For that two weeks from there, a week after that is when I received my hourly pay.
Q Okay. So sometime after two weeks or so after?
A Yes.
Q Okay. Who informed you that the pay structure would be changing?
A That was a meeting held on March 3rd.
Q Okay. And who held this meeting?
A A meeting was held. I don't recall over what medium, but it was a teleconference-type meeting. It may or may not have included video. I don't recall. Leo.
Q My question was just: Who held the meeting? But thank you for the background.
A Leo held the meeting.
Q Okay. Did you ask any questions about this

change in pay structure? Did you ask Leo any questions at that point?
A Yes.
Q What questions did you ask him?
A The first time that Leo informed us that there was going to be a change to hourly and that everyone would now be on an hourly pay scale, he was asked -- I asked him, "Why the change?"
Q And what did Leo tell you?
A He informed me that because of the various laws through the United States and because of job classifications, that we would -- we are hour -- are becoming hourly employees.
Q Did you ask him any follow-up questions?
A At the point he said that, I asked immediately, "What about overtime?"
Q And what did he tell you?
A He responded, "We will take care of that when we get to it." I asked again, "No. What about what we've done? What about overtime?" He responded that we would take care of that when it happened. I didn't ask again, to my recollection.
Q When you say "what we have done," what did you mean by that?
A During the meeting, Leo had stated that some of

the Lieutenants on the call were already hourly, and I became concerned because I was doing the same job that they were, and I was being paid salary. And I was one of the first employees that signed on when the company started to expand, and I had been doing this job all that time and just collecting my paycheck, and I became concerned at that point as to why some people were getting paid hourly already and I wasn't. So I wanted to know why -- or what about any overtime that I'd done?

Q Okay. And what did Leo tell you?

A He said that we would take care of any of that at a later point.

Q Okay. And you mentioned other employees were already being paid hourly. Are you aware what their hourly wages were?

A No.

Q Are you aware of whether they were receiving the $500 monthly bonuses?

A No.

Q Okay. Are you aware of any benefits they were receiving?

A No.

Q Any stock options they were receiving that you had?

A No.

Q And what was the amount of your stock options, if you can recall?
A Fluid was not a public company yet; however, it was my understanding that they would offer me options to purchase stock in their company and that I would be given a total of 4,000 options if I stayed with the company for four years.
Q Okay. Understood. And did you ever receive those stock options?
A I received partial stock options. Upon my termination, I had qualified, up to that point, prorated for 833 shares.
Q Okay. And about how much were those shares worth?
A Again, Fluid was not public at that time, so I could purchase them at a dollar per share.
Q And did you purchase any?
A I did. Purchased all of them upon my termination.
Q And do you know how much they're worth now?
A To my knowledge, still worth a dollar. Fluid's not a public company yet.
Q Okay. Understood. So you're still holding onto those stock options?
A Correct.

Q Okay. And you testified before that you weren't aware that these other employees who were already hourly -- you're unaware of whether they were entitled to any stock options?

A I wouldn't know. I didn't negotiate anything with them in their employment. I wouldn't know.

Q Okay. Understood. When this -- After this pay structure changed, you testified earlier that you were required to clock in and clock out; is that correct?

A Did you say "were" or "weren't"?

Q So when this changed and you became an hourly employee, you testified that you were able to clock in and clock out for the day; is that correct?

A Yes. After March 3rd's meeting, it was a requirement.

Q Okay. So did you clock in and clock out every day, then?

A Every day that I could, yes.

Q What do you mean by every day that you could?

A The problem -- or the issue with Zoho, it was a new system in the Zoho application, so there were many times in the early weeks that you could clock in and it wouldn't take it or -- or you would attempt to clock in and it would say, "Well, you're not on your schedule, so we're not going to count you." There would be like a

warning box that would come up and say, "Your schedule is not for this time. You can't clock in."

There would be times that I had clocked in and clocked out, especially in the first full week after the meeting, where I attempted to clock in and clock out, and it said I did, but it actually didn't.

Q Okay. I'm just going to hold you on that question. I just want to ask briefly if we can go off the record. I'm going to briefly look at my notes. Hold on just one second.

MR. WELMAKER: Sure.

THE WITNESS: May I ask -- May I ask for a break at this time since we need to do this?

MS. PAGE: Of course, yes.

MR. WELMAKER: Yeah, let's take a five-minute break, if that's okay, Erika.

MS. PAGE: Yep. That's wonderful. Thank you.

MR. WELMAKER: Okay.

(Recess from 12:24 P.M. to 12:37 P.M.)

MS. PAGE: Ms. Williamson, would you mind just reading Mr. Hoffman's last answer back to me? I just want to make sure I have the correct follow-up.

(Requested portion of the record read)

Q (BY MS. PAGE) Okay. Understood. Just a few

follow-up questions to that. After the first few weeks, did the Zoho system clock-in and clock-out resolve?
A I can't accurately respond to that because during the entire time that I was with Fluid, from when they started the clock-in/clock-out on March 3rd or March 4th, whenever it was there, until I left, sometimes there were other issues with Zoho that precluded or that it would not work, but it could be fixed by my manager.
Q And did your manager fix it?
A Not always, no.
Q Okay. And how many times do you estimate that you weren't able to clock in and clock out?
A I can't give you an exact answer. I would say less than ten.
Q Okay. So all those other times, there weren't any issues; correct?
A Correct. After they fixed the majority of those early issues, then it went okay.
Q Okay. Understood. Did Zoho record any overtime hours for you after those issues were fixed?
A After March 17th, I did not work any overtime. March 17th of 2021.
Q And is there a reason for that?
A March 17th of 2021, a meeting was held between

myself, Jennifer Gray, and Leo -- excuse me -- between myself and Jennifer Gray and J.D. Spiller, and I was informed that we could not work any overtime without permission from Leo directly.

Q Okay. And did you ever then seek permission from Leo to work overtime?

A No.

Q And why not?

A Because reaching Leo directly, as I was instructed, would not be in Leo's best interest and because the lead-up to the March 17 phone call prior to that gave me the impression that we were not going to work overtime at all.

Q And what gave you that -- What about the phone call or the meeting gave you that impression?

A I'll need to go back to the prior week before March 17th. March 8th, I believe a Monday, I worked 11.1 hours. For the week of that March 8th -- from that Monday to that Sunday, I worked 51.1 hours. When I reviewed my time in Zoho, all of the time from March 8th was missing.

I informed my immediate supervisor, J.D., over Cliq, I believe, which was a company messaging service, of my hours for Monday, and he replied, "Yes, sir" -- to me he said, "Yes, sir," which I understood

that he would correct that. He did not correct it.
I sent an email to Tiffany Lee, and I informed her of those hours and asked her to correct it, and she replied to me that it doesn't matter anyway because I was still on salary.
Q Okay. Understood. And you said that you worked 11.1 hours on March 8th; correct?
A Correct.
Q And how did you know that you worked those hours -- that amount of hours?
A I noted the sign-on that morning, that I signed on at a particular time, and then when I clocked out was 11 hours -- just over 11 hours that day.
Q Understood. And that's --
A However, Zoho would -- Zoho would not -- I did the clock-in and clock-out, and then when I reviewed my hours that week on Zoho, it wasn't there, and that's when I informed my manager, my Fleet Manager.
Q Okay. And did any of your managers or anyone else at Fluid say -- like, inform you that you would be switched over to hourly after you were required to start clocking in and clocking out?
A In the meeting March 3rd, we were informed to begin clocking in and clocking out immediately.
Q Okay. And did they tell you when you would be

switching over to hourly?
A Leo said "immediately."
Q Okay. Did anyone else tell you any different?
A Yes. Tiffany did after I questioned my hours on March 8th.
Q Okay. Understood. Did you ever ask anyone else any additional questions about this discrepancy?
A The March 8th discrepancy?
Q Yes.
A I discussed that with J.D. Spiller, my manager, and then also with Tiffany Lee through email. I may have received a phone call -- I'm not sure -- from -- I believe her name was Alex, who was also in Human Resources as an assistant. I -- I don't know that she's even there anymore. I really don't know her name. I have the emails from Tiffany.
Her response to me -- to my initial email -- I don't have the email in front of me -- was something to the effect of, "I discussed it with Leo and that he also said that you're on salary until the next pay period begins, which is March 17th." That was a Tuesday.
I responded to that email, "The pay week starts on Monday, which would be March 16th, so will any hours that I work March 16th count towards my pay for

that week?" She responded by email, "No, because you are still on salary March 16th," or something to that effect. I believe that Doug has those emails and they were provided.

Q Okay. Understood. What did Mr. Spiller tell you?

A Mr. Spiller responded, "Yes, sir," when I asked him to enter my hours for March 8th.

Q Okay. And what about this woman named Alex?

A The only thing that I can recall, if it was a discussion with Alex at that time about this particular overtime scenario, was -- she -- she just wanted to understand what I was asking again, and I advised her that that's what I was asking. Again, though, I may have had that discussion with her at a later date from that time. I recall her name. I recall she was an assistant, and I recall that we did discuss overtime but that she was not aware that that was the rule that was in effect with Leo.

So it may not have been -- Again, I'm trying to recall as best I can from 18 months ago, but I do know I have the emails and I can provide them, or I think we already have.

Q I believe you have.

A Okay.

Q I would just ask, on the record, to the extent that your counsel has not provided anything, that we receive that as soon as possible.

MS. PAGE: Understood, Doug?

MR. WELMAKER: I think we've produced everything, but I'll double-check.

MS. PAGE: Oh, good. Wonderful.

Q (BY MS. PAGE) Why did you ultimately leave your employment with Fluid, Mr. Hoffman?

A They rolled out the new changes to the bonus system on KPIs to begin sometime in September. During the period of September and October, I attempted to negotiate those KPIs, to advise my Fleet Manager and his supervisor through several calls. I can't tell you how many because they could have been just during the day.

I know there was one particular meeting at the end, when I did resign, that I had expressed that the KPIs that they were requiring us to complete could not possibly be completed in our market because, one, a major portion of those KPIs were that vans that were -- that the -- out of the total amount of vans in your fleet, a certain percentage had to be available for rent at all times.

And the reason that I advised them that that could not be done was because the size of the fleet

and that percentage would mean that only a very small number of the vans could be in the shop for work, and that was out of a Lieutenant's control. We can't control what the renters do to the vans. We just have to fix them before they get rented again.

Q Sure. Sure. Absolutely. So is your testimony, to just clarify for the record, the primary reason for you resigning was that you weren't able to negotiate your KPI bonuses any longer?

A The primary reason was I was not able to convince them that that certain KPI couldn't be accomplished, even though I had held many meetings with my manager and his supervisor, and I was told just flat out, "It's not a negotiable item"; therefore, I resigned my position.

Q Okay. Understood. And I do apologize if these are a bit repetitive. In terms of -- Did you receive -- When you became a Fluid employee, did you receive any forms detailing Fluid's wage and hour policies?

A No.

Q You received no forms detailing its wage and hour policies? Is that accurate?

A There were no policies when I became an employee, to my knowledge.

Q So your testimony is not only that you did not

receive any forms, but it is your knowledge and belief that there was, in fact, no wage and hour policies when you were hired?

A Correct. To my knowledge and belief, I was not aware of any policies, and I was later informed that there were none.

Q Okay. Who informed you that there were none?

A Tiffany Lee, head of Human Resources.

Q And do you have any documentation about that?

A Yes. We have emails that she has sent to me that I believe Doug can send to you if we've not already.

MR. WELMAKER: We've already produced it.

MS. PAGE: Okay. To my knowledge, for the record, there isn't anything there that says specifically that there were no wage and hour policies, so, then, if you do have anything additional, we would just ask for that.

MR. WELMAKER: I think the documents -- the emails speak for themselves, but I think she said there were no written policies at all.

MS. PAGE: Okay.

MR. WELMAKER: I mean, we can go back and reread it.

MS. PAGE: To the extent that we don't

have that, we would ask for those.

MR. WELMAKER: You have it.

Q (BY MS. PAGE) Did you ever receive a specific employment agreement from Fluid, Mr. Hoffman?

A I'm sorry. I'm kind of partially reading your lips, but --

THE WITNESS: Doug, I think you moved into the forefront and she moved into the back, and I can't look at her and see what she's saying. She's really small. I don't know how they got switched.

(Simultaneous cross-talk)

THE WITNESS: There you go. Okay. Now we're good. Go ahead and ask again.

Q (BY MS. PAGE) I'll repeat the question. Mr. Hoffman, did you ever receive an employment agreement from Fluid?

A I received an offer of employment. I do not recall an employment agreement, again, only because of how long it's been.

Q Sure. Do you recall what that offer of employment said?

A That was the offer of employment letter that said I was being hired -- hired in as an Automotive Dry-Tech at 45,000 per year, full-time, bonus to be achieved on KPIs of 500 a month, and I'm not sure what

else it may have said. I believe that we've also sent that letter. I -- I would just ask for Doug to clarify that.

Q I believe we did receive that letter from Doug, yes. And did this particular offer letter address anything regarding overtime?

A No.

Q And your question -- You testified previously that you did not ask Fluid any questions regarding overtime upon receiving this letter; is that correct?

A That's correct.

Q Okay. And you testified before that it was your understanding that you would be required to work overtime at some points; is that correct?

MR. WELMAKER: Objection; form.

You can answer.

THE WITNESS: It was my understanding that I would -- was being hired in to help build the market and do whatever is necessary to build the market.

Q (BY MS. PAGE) And that included working overtime on occasion; correct?

A It was understood that if that's what was necessary, I would do it.

Q Okay. Understood. Thank you. And, again, I apologize for being repetitive, but I just need to do my

own due diligence.

Did you ever receive an employee handbook from Fluid, Mr. Hoffman?

A Not at the time I was hired.

Q At any point during your employment with Fluid, did you receive an employee handbook?

A Not from Fluid.

Q Okay. Who did you receive it from?

A TriNet, the payroll company that they used when they moved over in October of 2020. I can't tell you the date. TriNet, as a payroll provider for Fluid, had their own handbook; however, that was TriNet's handbook, and anything in there referring to the specific company in that handbook, they would say, "Ask your company representative."

Q And were you ever required -- Even prior to the changeover to the hourly wage rate, were you required to record your hours at all in TriNet?

A No. Never.

Q Okay. Understood. Were you required to request PTO dates in TriNet?

A There was a form to request PTO, but I cannot tell you it was a TriNet form or a Zoho form or what was called in our system -- if you got on our computer in -- in Fluid, there was a form to request PTO, but I do not

know whose form it was.

Q Okay. Understood. So your testimony is, just to clarify for the record, that you were required to fill out some sort of form to request PTO, but prior to the switchover to hourly, you were not required to otherwise record your hours or your clock-in and your clock-out times each day?

A I would ask clarification as we're moving between two separate things.

Q Okay. So there was a form to request PTO time; correct?

A After TriNet switchover, yes.

Q Okay. There was --

A To my knowledge.

Q There was no form prior to TriNet?

A I can't recall whether there was. If I needed any time off before that time, I would just discuss it with my Fleet Manager and they would arrange it.

Q Okay. Understood. And even during the time you switched over to TriNet, before you became an hourly employee, you still weren't required to clock in or clock out; correct?

A Correct.

Q And it's your testimony that you only logged your hours on some of the jobs you performed; is that

correct?
A That is not correct.
Q What is your testimony, then? Because there were some jobs where you logged your hours on Zoho; is that correct?
A That is also not correct.
Q Can you explain? Can you --
A Yes. As I stated before, the purpose of Zoho was to create whatever form was in there. For example, if I did a vehicle inspection, I might -- it might take me anywhere between 20 minutes to an hour to do the inspection on that vehicle. When I finished the inspection, I would go to Zoho, open the form for vehicle inspection, fill out the form, and that was done.
So the form was required, but the time for the inspection could happen anywhere from 20 minutes to an hour or more, depending on what I needed to fix on the vehicle. The form was required to be filled out at the end, but there was no log-in or log-out of any time, just the form.
Q Did the form include the hours that you spent performing those jobs?
A No.
Q Okay. But the form was time stamped; correct?

Can you explain why it was time stamped?
A Yes. So to give you an example, going back to the inspection example, I may arrive to do a monthly inspection on a van and do all of the things that needed to be done to inspect it, a safety inspection, and at the end of whatever time that took, including any services I may need to do to it, then I would go into Zoho, pull the app up on my phone, specify that it was an inspection, specify the unit number on the van. I did not time stamp it. It was an automatic stamp. I didn't do it. It was just automatic. That's what I mean.
Q Okay. Understood. To your knowledge, after all -- in addition to all the documents we previously discussed, have you received any other documents bearing Fluid's name?
A I got a paycheck.
Q Okay. Anything else?
A Emails that Fluid sent me back and forth would have Fluid's name on them. Anything that was sent to my house from Fluid would have Fluid's name on it. That would be -- Sometimes things would have Fluid's name on them sent by other companies to me because my house served as my office, so...
Q Did you ever sign any other documents bearing

Fluid's name?
A I'm sure that I did, but I can't recall what they might be.
Q Understood.
MS. PAGE: Mr. Welmaker, just to ask -- to the extent they haven't been produced and to the extent that they are still there, I just want to make a formal request for any paycheck copies that Mr. Hoffman has, as well as any other emails between Mr. Hoffman and Fluid personnel, to the extent that they haven't been produced.
MR. WELMAKER: Yes, yes. I think we've produced everything, but we will definitely double-check.
MS. PAGE: Yes, yes. And, again, copies of paychecks, to the extent that they're available, as well as W-2 forms. I know we don't have those.
Q (BY MS. PAGE) Mr. Hoffman, you testified previously that you've received health insurance from Fluid; is that correct?
A Correct.
Q And you believe you also may have received dental benefits?
A I cannot recall, but I know that I -- I may have received them, yes.

Q Okay. And your testimony is the same as to vision benefits; correct?
A Yes. I may have received those, also.
Q Okay. And same with life insurance benefits?
A Yes. Again, I can't recollect -- without taking one of my pay stubs out to look directly, I can't recollect at this time.
Q Okay. Understood. As well as stock options? You also received those?
A After I purchased them in November of 2021, after I left the company, I received 833 stock options.
Q Okay. Understood. And did these benefits change at all when Fluid's pay structure changed?
A No.
Q No? Okay. I know we went through this briefly before, but I just want to kind of do my due diligence here. Can you describe a typical day for me at Fluid?
A Okay. I would wake up in the morning. I would turn on my computer or laptop or tablet, whatever I had available, and review what needed to be done for the day. That would be encountering -- doing -- looking at my Fluid emails. I'd also need to look on my phone for any Slack or -- Slack messages or Cliq messages. That was the messaging service that the company used.
Whatever was in there could come from

anybody or sometimes it was an automated message that something was going on. An example of that might be a van has a low battery and it's below the threshold that it's going to start or that the telematics aren't working in the van. That's -- that's two things that would be automatic messages.

I may receive a call or a message from my sales managers with a voicemail or a message that says, "This certain renter has a flat tire," or, "Their tire is low," or, "They locked themselves out of a van," or whatever things needed to be done like that, immediate, on-the-spot things to keep the renters happy.

I may have to print up license plates -- temporary license plates or registrations or insurance documents, dependent upon what van that it was, that it was either reported missing by a renter or that the plate had expired, something like that. I'd have to review those.

Then I would make any calls that I could during that time, and sometimes it was too early. I'm a very early riser, and the majority of my day began between 3:00 in the morning and 5:00 in the morning, because the renters were on set schedules for when those routes had to leave. The majority of renters for our vans were delivery companies, so it could be Amazon or

it could be FedEx or it could be UPS or some other franchisee of those companies. So they have set times they can run their routes, so I have to arrange all of this at the beginning of the day so I don't arrive to someplace and there's no van there to do.

At that point, I would gather up anything that I needed, and when we had a shop, which was after, I believe, July of 2020, I would travel to the shop to get anything that I need, if I needed anything, and then from there I would go out to whatever needed to be done.

My top priority was my customers. Current customers, they are the money. Keep their wheels rolling. So those were my priority. So then -- And the -- And the -- And the way I set priorities was: Take care of whatever they need first and then do whatever need -- is needed for batteries, telematics, or plates.

There was a requirement -- I don't know if it was written, but it was instilled into our heads from Leo, Jen, and J.D. that the time is 24 hours. From the time whatever you see comes through on that automatic message, whether it's telematics, whether it's battery, whether it's license plates, you have -- onboarding, like a brand new van comes in, if you're notified of it, then -- then our -- our time is 24 hours to get it

completed, bar none.

I recall we even had a meeting one time where Leo had said, "It was 24 hours," and I said, "But, Leo, does that mean weekends and holidays?" and Leo specifically said, "Yes, it means weekends and holidays," so I had to schedule those.

Once that was done, then I could move on to any vans that needed inspected for safety inspections and any services that I needed to do during the day as long as the vans were there. Now, services and issues -- an issue is created by either me or Customer Service. A service is when I correct it.

So an example of that might be a customer service representative gets a call at 10:00 at night and said -- the renter says, "Hey, the driver brought my van back here and the taillight is out." Again, that's a priority now because I've got to go fix that because there's no other van they can rent, and so I've got to go fix that. So I'll perform a service the next morning on that, so I have to schedule that. So --

Q Anything else -- I think you were extremely thorough with your responsibilities, and I thank you for that. Is there anything else, just in a typical day, just specific tasks that you would do?

A Thank you. I'm not even halfway through my

day. I need to go on.
Q Okay.
A At that point, anything that I noticed on any of my inspections that needed to be completed, I had to determine whether I could complete it on site or whether I needed to schedule that with an outside vendor. After all of that was done, then -- When the majority of my vans were gone for the day or maybe were out on routes, but not coming back until a later part of the day, then my job was to, again, take care of any customers that I've missed, any new calls that have come in, and then also follow up on any vans that were off site with any vendors.
Once that was completed, then at that point in the day, I usually would touch base with my Sales Manager and ask my Sales Manager, "Is there anything else that needs to be done?" and he would either respond he's got something or he doesn't. Sometimes then, at that point, it would involve that -- "I have nothing else, but I need six vans transferred to such-and-such place," so then I would go start working on that.
Then at the end of that, when all that was done, if there wasn't anything that I had to get in the evening, like -- sometimes we had box trucks, that they

ran from 4:00 in the morning -- 2:00, 3:00, 4:00 in the morning all the way until sometimes 6:00, 7:00 at night. So then if those were needing inspected, I might go out after hours and do those.

And pretty much at that point, if everything was done, then I would either travel back to the shop, finish up whatever I needed to do there or load up for tomorrow, plan my day for tomorrow as best that I could, come home, or I would come straight home, plan my day as best as I could for tomorrow with what I knew about today and then start all again tomorrow. And that would encompass an average day of a Lieutenant.

Q Okay. Yes, so very thorough. I thank you for that. I know you testified that your day is found -- pretty busy. Did you ever have time -- Did you ever have break time at Fluid during that -- at that point?

A There was no set break times in my entire employment with Fluid --

Q No set break times --

A -- even after hours.

Q Okay. Were you given opportunities throughout the day to get your break, either when a van wasn't ready or there weren't service calls coming in or in some other instance?

A Yes. At some point during every day, there was

going to be a time where I could grab a quick bite to eat or breathe or -- or sit in the shade or something like that, waiting, yes.

Q Okay. And about how long were those breaks, on average?

A Again, it was whatever the job required.

Q Okay.

A I -- I hate to keep going back to that. I'm trying very hard, but you have to understand the attitude at the beginning with Fluid, if I may expound, and that is that it is a "whatever it takes" attitude to build the company. My company -- My company --

Q I understand, Mr. Hoffman, but thank for elaborating on that.

A Okay.

Q So are you aware -- Did all the other Lieutenants have a similar type of day to you or did you just kind of go above and beyond?

A I considered myself an above-and-beyond employee, but several Lieutenants would have days similar to mine, depending on what was required of them; however, I can't respond for all Lieutenants, as I don't know all the Lieutenants that worked at the company.

Q Understood. Did this typical day change for you after you became an hourly employee?

A Yes.
Q And how did it change?
A When the requirement was put in place to me that I could no longer do overtime without any advance permission, my day was an eight-hour day every day or a 40-hour week every week, meaning that there were still some days I may work longer, but I would be given comp time later in the week just -- to justify that, but after the March 17th meeting, there was not any week from there until the end of my employment that I worked overtime.
Q Okay. Understood. And prior to this changeover to an hourly employee, did Fluid ever tell you that you needed to get permission for working a certain number of hours per week?
A No, ma'am. It was celebrated.
Q Okay. So were you ever complimented for all the work you put in?
A Absolutely. Quite a bit.
Q To your knowledge, were any other employees who maybe didn't go above and beyond like you did -- were they ever admonished or told to work more --
A I have no knowledge --
Q -- to your knowledge?
A -- of whether they were admonished. That

wouldn't be for -- something I would know about. I do know that they were also celebrated if they went above and beyond. We would have weekly meetings with our Fleet Manager and our Fleet Supervisor, Jen and J.D., and they would actually single Lieutenants out who have gone above and beyond or worked until midnight or 2:00 in the morning or those things.

I also -- Jennifer Gray, who's the Fleet Supervisor, would also direct other Lieutenants to call me to tell -- have them quiz me on how I do my day so that they could get more accomplished.

Q Okay. Understood. Did you report to a supervisor at the beginning of your day when you were still salaried?

A I had -- I had four -- four or five supervisors. Did I have to -- Was it required for me to report -- like if I'm -- I'm starting at 5:00 in the morning, I need to call somebody and report? No, there was no requirement.

Q Were you required to them -- or excuse me. Strike that. Were you required to report to any of your supervisors at any point throughout your day?

A If there was a scheduled meeting, yes. Otherwise, no.

Q Okay. And what were the names of your

supervisors during your tenure at Fluid?
A I'm going to go back to as far as I can in Fluid to remember. I do recall that, initially, my -- my initial supervisor was Leo Amigoni.
Q Okay. Yes.
A That was a very short term and then it became Jennifer Gray, and my -- my -- my way I reported was either to Jennifer or to Leo if I couldn't get hold of Jennifer.
Q Okay.
A It came from there to my next supervisor, who was J.D. Spiller, who was my last Fleet Manager. Again, if I couldn't get ahold of him, I tried Jennifer or I tried Leo. My other -- My other person who I reported to constantly and we planned and scheduled things was my Sales Manager, Erin Baker.
Q Okay. And did you schedule things with Ms. Baker both when you were a salaried employee as well as a hourly employee?
A Yes, and it's Mr. Baker.
Q Oh, Mr. Baker. I apologize.
A And when I say "schedule," I mean that in our conversations, if something came up -- as I mentioned before, if -- during my day, if I called him and said, "Hey, do you got anything else right now?" he might say,

"I have a customer with a" -- "they're saying the air conditioner is out on the van, but they won't be back in until such and such a time. Can you go out and check that?" something like that, but it wasn't --

Erin was our Sales Manager, and I more collaborated him than sup- -- than he supervised me, but everything Erin wanted, that was my job. If I didn't support my Sales Manager, this market didn't function, so...

Q Okay. And do you know if Erin was required to report to anyone?

A I don't know all of Erin's reports. Erin was a Sales Manager.

Q Okay. Understood. Did you ever supervise any individuals during your employment? And we'll limit that to when you were just a Lieutenant.

A No. When -- Well, yes, and -- I'm not quite sure how to answer this. If I can explain. We -- When we had to move vans, if there were several of them to move, we had independent contractor drivers, and so it would be my job to call them and say, "Hey, can you come and help?" and then direct them, "We're going to such-and-such place."

Q Okay.

A Also, our vendors, of course, I had to work

with them and direct them to do work.

Q Let's limit this even more. Were you ever required to supervise any other Fluid employees?

A Not direct employees, no, until they made me a Senior Lieutenant without my knowledge and then they wanted me to be constantly available for them if they had questions or needed help or needed me to -- if they were local or in an area I could travel, needed me to go help them do whatever they needed to do or they would come to -- up to my market and ride along with me.

Q Okay. During your tenure at Fluid, did you ever receive any discipline from anyone?

A Other than the normal course of a day in building a market where, you know, my -- my Sales Manager or me might get into an argument about what we're doing and then we would resolve it or my Fleet Manager might say, "I need you to do this," and I would say, "I can't do it," or, "No, I wouldn't advise that," and then we would argue. Arguments were a part of Fluid from the time I started to the time I left.

Q (Audio interference) discipline; correct?

THE REPORTER: I'm sorry?

THE WITNESS: What's that?

Q (BY MS. PAGE) But no discipline; correct? From anyone at Fluid?

A There was no discipline on me that I can recall anybody ever bringing to me and saying, "This has to stop or else," no.
Q And just to clarify for the record, you never -- prior to becoming an hourly employee, you never documented the hours you worked; correct?
A Prior to becoming an hourly employment -- or employee, it was just stow and go. There wasn't --
Q Okay. So, no, you did not?
A No, there wouldn't have been any hours I would have documented.
Q Okay. And just for the record -- I want to make it as clear as possible. How often do you claim working over 40 hours a week?
MR. WELMAKER: Objection; form. Asked and answered.
Q (BY MS. PAGE) So is your testimony that you worked over 40 hours per week approximately 40 to 45 weeks accurate?
A To the best of my recollection, I would say that, yes.
Q And your testimony is that some weeks you worked up to 65 hours a week; correct?
A That's not correct. In my testimony, I stated that if I had to average it, I would say 60 to 65 hours.

There were some weeks I may have worked more. There were some weeks I may have worked less, but in the scope of the weeks that you discussed with me, the 40 to 45 weeks, I would say somewhere in there, yes, it would be that.

Q And of those weeks -- About how many weeks did you work less than 40 hours a week?

MR. WELMAKER: Objection; form.

Q (BY MS. PAGE) Just -- just based on your estimates.

A The beginning of my employment until we actually had vans shipped in was the prior amount of weeks that I talked to you about, about I may not have worked 65 hours a week. I can't give you those hours because those weeks were filled with meetings with my Sales Manager, constant meetings with my company, meeting with customers, meeting with vendors, and those things just -- I can't estimate.

Q Okay. Understood. What about -- Are there any weeks that you worked less than 40 hours per week?

MR. WELMAKER: Objection; form. Asked and answered. Erika, you've already gone over this.

MS. PAGE: I don't believe the record was clear, Doug. I'm entitled to take your client's deposition.

Q (BY MS. PAGE) You can answer, Doug, in case that wasn't -- or Mr. Hoffman, in case that wasn't clear.

A All of the weeks from March 17th, 2021, to the end of my tenure with Fluid, I never worked more than 40 hours a week.

Q Okay. And anytime when you were a salaried employee, you believe you worked less than 40?

A As I just stated, in the beginning, the first couple of weeks, before we had vans and anything to do, I can best estimate that my hours were such, but I don't know.

Q Okay. Understood. And, again, this may be a question for your counsel, but I do need to ask. Approximately how much money are you claiming you're owed?

A I would refer to the interrogatory. We figured that out, but I don't have it in front of me.

Q Okay. Other than that interrogatory response, do you have any other documents evidencing this?

A I -- No.

Q Okay. And any other documents showing jobs that you performed for which you weren't compensated?

A I'm not sure I understand the question, when you say which I wasn't compensated.

Q Any other jobs that you performed that, for example, weren't listed in Zoho? No documents of those --
A That's --
Q -- jobs or how long (Audio interference) --
A That weren't time stamped --
THE REPORTER: Hold on.
THE WITNESS: -- in Zoho?
THE REPORTER: Hold on. Y'all talked over each other. "No documents of those jobs or how long" --
Q (BY MS. PAGE) No documents of those jobs or how long they took?
A Yes, I can list those. I can list some of those jobs off the top of my head.
Q That wasn't my question. I do have those jobs, and I thank you for that, but just clarifying that you don't have any documents describing those.
A No.
Q Okay. Understood. Apart from your conversations with Mr. Spiller, Ms. Lee, Ms. Amigoni, and the woman from HR named Alex, did you make any other complaints regarding your wages during your tenure at Fluid?
A Tiffany Lee.
Q Yes, I did -- Anyone else besides Ms. Lee and

the other people that I mentioned?
A They would have been who I discussed that with.
Q Okay. Thank you. Just turning to this present lawsuit, what made you -- when did you decide to file this present lawsuit against Fluid?
A Based upon the phone call that we had March 3rd of 2021, when we were informed that we had been misclassified, that we would be starting hourly immediately due to the various laws, everything that Leo had told us, and that caused me to question all of the time that I worked before that, why I wasn't on hourly when some Lieutenants were already being paid hourly. That's what caused me to file this lawsuit.
Q Understood.
A And then based upon my discussion with Tiffany when I worked the 51 hours during that next full week and I was told, "It doesn't count. You were" -- "You were salary up until a certain point, and we'll start you on hourly next week," and that's when I started to question, "Wait a minute. What are we doing here?" and that's why I filed this lawsuit.
Q Did you contact an attorney at that point?
A I contacted Doug.
MR. WELMAKER: Do not discuss anything that we talked about.

Q (BY MS. PAGE) Okay. So you specifically contacted Doug? He did not contact you first; correct?
A That is correct.
Q Okay.
MR. WELMAKER: No, I did not solicit him, if that's what you're asking.
MS. PAGE: It's not what I'm asking.
Q (BY MS. PAGE) After you filed the present lawsuit or the time -- even during the time leading up to it, did you have any conversations with other Fluid employees about joining the lawsuit?
A No.
Q Okay. Have you had any conversations with other Fluid employees since then?
A Since what point, please?
Q Since filing the lawsuit.
A Well, yes. I worked with them every day.
Q Did you discuss this lawsuit with them?
A Absolutely not.
Q Okay. So is your testimony that you did not discuss this lawsuit with anyone at Fluid?
A My testimony is, is that I never discussed that there was even a lawsuit at Fluid.
Q So you never discussed that with any Fluid employee; correct?

A During the time I was working at Fluid?
Q During the time you were working at Fluid, did you discuss the lawsuit with any Fluid employee?
A I'm going to go by my best recollection here. That is at some point after the lawsuit was filed and at some point after Erin may have been terminated, I don't know whether I was asked or I talked to him -- I think it was because Erin had discussed possibly filing a lawsuit that I advised Erin that I had filed one; however, I did not get into the details of any of the lawsuit other than that I was filing for overtime wages that I earned prior to going hourly.
Q Understood.
A Also, Scott Lee, who's still working with the company, and I were discussing the fact that the company would not fire anyone for a period of a few months, and Scott Lee said to me that there was -- he understood that there was a lawsuit in place, and the discussion turned to: Was it because of going to hourly? And I advised Scott Lee, that, yes, it was, and that was the extent of my conversation with Scott Lee. That was it.
Q Okay. Did you discuss the lawsuit with any Fluid employee after you ended your employment with Fluid?
A No, because Erin was no longer an employee.

Q Okay. Any -- Let me rephrase. After you left Fluid, did you discuss the lawsuit with any current or former Fluid employees?
A I have talked to Erin since I left Fluid approximately two times, and to my best recollection, he's asked me how things were going, and I've told him that there's nothing that is resolved yet.
Q Okay. Have you spoken with any other current or former employees from Fluid?
A Not to my recollection, no.
Q Okay. Have you had any conversations with anyone about whether they'd be willing to testify on your behalf if called?
A None. Zero. None.
Q Okay. Understood. And just -- just to kind of, again, be thorough, Mr. Hoffman, what damages do you believe you're entitled to in this case?
MR. WELMAKER: Objection; asked and answered.
You can answer.
THE WITNESS: I would refer to our interrogatory for the legal damages allowed.
Q (BY MS. PAGE) Okay. Understood. And do you know how you came up with that number range or did you -- or is that something your attorney did?

A It is my understanding that I had to first determine how many hours of overtime I could have worked a week times time and a half, and then there were also -- there were allowed damages if -- on the case. That's my understanding.

Q Okay. And you estimated what you believed counted as overtime per week?

A The best -- To the best that I could do, yes.

Q Okay. Understood.

MS. PAGE: I just want to take another brief five-minute break. Doug, I have about six documents that I just briefly want to share with Mr. Hoffman at that point. Again, this should be very quick. So if we just want to take a brief five-minute break, I just want to look at some of those and then we can go back on the record and then, hopefully, only have like 15 or so more minutes.

MR. WELMAKER: Okay.

MS. PAGE: Does that work for you, Mr. Hoffman?

THE WITNESS: Yes. May I go ahead and mute now?

MS. PAGE: Oh, yes.

(Recess from 1:28 P.M. to 1:37 P.M.)

Q (BY MS. PAGE) So I am going to be sharing my

screen with you. I have done this a few times before, but just bear with me. So, Mr. Hoffman, just -- I'll begin to question you about a document, but just pause. Make sure you've had a -- make sure you have an opportunity to review it.

(Exhibit No. 1 marked)

Q (BY MS. PAGE) Are you all able to see this two-page document that's currently up on the screen?

A I see a half a page, yes.

Q Okay. Yes. I will -- I will make it a bit smaller and I will scroll down.

A Okay.

Q I want to introduce this as Fluid Exhibit 1. It is a document produced by Plaintiff's counsel, Bates stamped Hoffman 0001 to 0002. Mr. Hoffman, it's about two pages long. Just take some time to review it and let me know when you're finished.

A Am I able to scroll down?

Q You should be able to.

A Okay. Thank you.

Q If not, you can let me know and I can -- I can scroll for you as well.

A All right. Let me try. It's not letting me do anything.

Q Okay. Let me know whenever you need to scroll

and --
A Okay. Right now I have read through "Benefits," the line that's titled "Benefits." Can you please scroll?
Q Okay.
A Nothing is scrolling on my end.
Q Is it scrolling now?
A No, it's not.
Q What about now?
A No. I only see through the line that says "Benefits."
Q Okay. I'm not totally -- I'm not entirely sure why. How about now?
A I don't know if anybody else sees it. I don't see it scrolling. It just says "Benefits."
MR. WELMAKER: No, it hasn't moved.
Q (BY MS. PAGE) Let me try one more thing. Okay. Can you see that offer letter now?
A Yes. I can see down to, "I am excited to present this offer to you and look forward to you joining Fluid Fleet Services, LLC," signed Jared Thompson.
Q Okay.
A I'll need to read it, though, if I can.
Q And I'm moving on to the second page. Can you

see that?
A Yes, ma'am, but I didn't finish reading the first one. I was just telling you what I -- what I saw at the bottom.
Q Okay. Here is the --
A Thank you. That's good right there. Thank you.
Q Okay. Wonderful. All right. So, Mr. Hoffman, whenever you're ready.
A Thank you.
Q Okay. And I will make these brief. It's, basically, just going over what this letter and what these other documents said.
A This --
Q This --
A This looks like the employment letter that I was referring -- the offer of employment.
Q Okay. Wonderful. And I do -- Just to speed this process along, that's what I was getting at, but I'll just ask brief questions. Okay?
A Yes.
Q So this appears to be your offer letter, and it states that your position was an Automotive Dry Tech; is that correct?
A Yes.

Q But your understanding was that was the same as the Lieutenant position?
A After I arrived in Denver, that was my understanding, yes.
Q Okay. Understood. That first -- or, rather, that third paragraph states, "Compensation: $45,000 per Year, to be paid bi-monthly as a full-time employee." Did I read that correctly?
A That's correct.
Q And then it states, "Bonus/Commission: Up to $6,000 if Management KPI's are met." Did I read that correctly?
A That's correct.
Q Okay. Then it states, "Benefits: You shall be entitled to participate in the Fluid Fleet Services, LLC employee benefit plans or programs. Fluid Fleet Services, LLC will cover 100% of our employees' monthly health premium up to a maximum of $350 per month." Did I read that correctly?
A That's correct.
Q Next line, it says, "Benefits: You shall be entitled to participate in the Fluid Fleet Services, LLC employee benefit plans or programs. Fluid Fleet Services, LLC will cover up to 100% of our employees' monthly health premiums up to a maximum cost of $350 per

month." Did I read that correctly?
A Yes.
Q Okay. Moving down, the next portion says, "Equity Position: Upon the approval by Fluid's Board of Directors, you will receive an option ('Options') to purchase 2000 shares of Fluid's common stock ('Common Stock')." Did I read that correctly?
A Yes.
Q Okay. Next paragraph, "Personal/Sick Time Off: Total of 80 hours per year (two weeks) accruing at a rate of 3.33 hours per pay period." Did I read that correctly?
A Yes.
Q Okay. Next paragraph, "Expenses: Fluid Fleet Services, LLC shall reimburse you for reasonable and necessary out-of-pocket expenses incurred by you in the performance of your duties howunder..." Did I read that correctly?
A The last word should be "hereunder."
Q I apologize. Thank you.
A And, yes, you read that correctly.
Q Scrolling to Page 2, and then it states, "Acknowledged and agreed to on the date stated above." Did I read that correctly?
A That's correct.

Q And then it says, "By: Rodney Hoffman." Is that your electronic signature?
A Yes.
Q And that's dated February 7th, 2020?
A Correct.
Q Okay. Great.
(Exhibit No. 2 marked)
Q (BY MS. PAGE) Moving on to Exhibit 2 -- All right. Mr. Hoffman, can you see this document in front of you? It's two pages.
A The only thing that I see is -- it says, "Failed to preview document," with a "Retry" button.
Q Okay. Hold on just a second. Okay. Mr. Hoffman, can you see this document in front of you now?
A Yes. I see half of it again.
Q Okay. Wonderful. Take an opportunity to review that half, and once you're finished, I'll scroll down.
A That appears to be a pay stub from TriNet for March 22nd, 2021.
Q That is correct, and I will -- I will discuss that with you as soon as you are finished reading it.
A Okay. (Reviewing document) Okay. I've finished reading -- I finished reading to where it says

"Taxes and Deductions."
Q Okay.
A If this is the rest of it, it starts at "Hours and Earnings"; is that correct?
Q Yes, that is correct.
A Okay. Thank you. (Reviewing document) Yeah. Then it goes on to my life and accident and health insurance and things like that. Yes, I see that.
Q And then if you just look at this other document, this is the second page of the PDF.
A Okay.
Q Just take an opportunity to review that.
A Yes. That's also part of a pay stub dated June 4th, 2021 --
Q Okay.
A -- is the "Check Date."
Q Okay. And just take an opportunity to review. Whenever you're finished, I'll --
A It's also a pay stub, including deductions.
Q Okay. Okay. Are you ready?
A Yes. Please go ahead.
MS. PAGE: Okay. So just to introduce this, these are sample pay stubs. I want to introduce those as Fluid Exhibit 2. They are currently (inaudible) as 0030 Bates stamp and then 0035 Bates

stamp. And Mr. Hoffman has correctly represented it, that the first page, Bates No. 0030, is a pay stub from March 1st, 2021, through March 15th, 2021, and the second is an earning statement from May 17th, 2021, through May 30th, 2021.

Q (BY MS. PAGE) So, Mr. Hoffman, the first appears to be an earnings statement from the dates March 1st, 2021, through March 15th, 2021. Is that accurate?

A Yes, what I'm looking at is accurate.

Q Okay. Yes. And at that point you were still -- your pay was still classified as $45,000 annually? Did I read that correctly?

A "Pay Rate: $45,000.00 Annual."

Q Okay. So at that point your pay stub indicates that you were still a salaried employee; correct?

A It does not indicate I'm a salaried employee on that pay stub. It states that my pay rate is "$45,000.00 Annual."

Q Okay. So you were paid annually? You had an annual salary; correct?

A Yes.

Q Okay. I just want to take a look at where it says "Hours and Earnings," and it indicates that your current earnings during that pay period, regular

earnings, were $1,951.71 that pay period; is that correct?

A Yes.

Q Okay. And then you also received a nondiscretionary performance bonus of 500; is that correct?

A Yes.

Q Okay. To your knowledge, was that based on your KPIs?

A That would have been on the KPIs for February.

Q Okay. Understood. And then going down one line, it looks like you received $15 for electronics. To your understanding, what was that for?

A That's for any use of my cell phone, my personal cell phone. They're paying for part of that use.

Q Okay. Understood. And scrolling down one more line, it says "Holiday," and then underneath "Hours" it says "32." What does that mean?

A I don't know, other than they're accounting for any holidays up to that point that they -- I -- From this -- I'm confused because this is a March date, so I don't know that those -- I -- They -- All it states that I see is 32 hours for "Holiday," but I'm not sure what holidays it involves. It's a zero on this pay stub,

so...

Q Okay. Would you be paid those 32 hours for working a holiday?

A There's only 24 hours in a day.

Q Let me strike that and rephrase. If you had worked 32 hours on various holidays, would you be paid extra for those hours?

A Using this pay stub, I can't discern. I would need to see the pay stubs where they showed me I worked those hours and was paid for them. I can't answer that question with this pay stub.

Q Okay. So I just want to scroll down where it says "Gross Pay." You see under "Current Earnings" it states "$2,466.71"; correct?

A Yes.

Q Okay. And then also under "Gross Pay" it states "Hours: 512 hours." To your understanding, what does that mean?

A I don't understand what that means.

Q Okay. Understood. And then --

A If I -- If I may, I can explain why I don't understand what that means.

Q Sure.

A If this is a pay period that began March 1st, then that means that prior to this pay period, those --

from what I understand -- Excuse me. The pay period ends March 15th, so from my understanding, that would be saying that up -- from January 1st to March 15th, I worked 480 hours and then there were four holidays that were 32 hours. That's what I understand from this pay stub.

Q Understood. And were you paid extra for the holidays that you worked?

A What's that?

Q Were you paid extra for any holidays that you worked?

A I don't recall being paid for holidays. I -- Again, I can only go off the stub you're showing me.

Q Understood. And you'll agree with me that up in this upper right-hand corner, it says "Net Pay" and then "$2,000" -- or, yeah, "$2,009.31"?

A That is my paycheck, my -- after everything's taken out.

Q Okay. Understood. And then just going down, it looks like you received benefits for medical, dental, vision, and life insurance; is that correct?

A Yes, ma'am.

Q Okay. Wonderful. Just scrolling through the next page, and this is a pay stub for the period May 17th, 2021, through May 30th; correct?

A Correct.
Q Okay. And this was after Fluid decided to make you an hourly employee; is that correct?
A Yes.
Q Okay. And it says "Pay Rate: $21.63 an hour"?
A Correct.
Q Okay. And at this point, it looks like you -- you also had 32 "Holiday" hours; correct?
A Yes. Again, understanding that that is what they're saying from the beginning of the year, not for this paycheck.
Q Okay. Understood. And it looks like there was no bonus received during this period; is that accurate?
A That is accurate.
Q And why wouldn't a bonus have been received?
A A bonus is paid for the prior month in the first paycheck of the month, not the second. This would be a second paycheck.
Q Okay. Understood. We can move on to Exhibit 3. I promise I will try my best to get this screen sharing correct.
(Exhibit No. 3 marked)
THE WITNESS: I'm going to mute real quick so I can cough, please.
MS. PAGE: Okay. No problem.

THE WITNESS: I apologize.

Q (BY MS. PAGE) No worries. Mr. Hoffman, I'll represent to you that you do not need to look at this entire document. I am just going to be questioning you with respect to certain pages to just keep it as quick and succinct as possible.

A This one is working, by the way. It's scrolling.

Q Oh, wonderful. I don't know why there is a difference, but I am just very glad that it is -- that it is working.

All right. So, Mr. Hoffman, I am at -- So, Mr. Hoffman, I'm on Page 24 of this document, so I just want to -- Actually -- I apologize. I'm going to go up to Page 22.

MR. WELMAKER: And, Erika, when you're doing that, can you also read out the Bates number for each page that you're referring to?

MS. PAGE: Yes. I apologize.

MR. WELMAKER: That's okay.

MS. PAGE: So I'm actually at Page 22 of the document, Mr. Hoffman, and I just need to scroll down to read that Bates number to make sure your attorney has that, so please bear with me. So it's Bates No. 000186.

MR. WELMAKER: Okay.
Q (BY MS. PAGE) All right. So, Mr. Hoffman, scrolling back up to this very first line, it looks like there's a "Service Entry Number" and then "Added Time," and that first line, it says -- and I'm highlighting it here -- it says 2-19-2021, at 10:34 A.M. -- 10:34:41 A.M. Did I read that correctly?
A Yes. 10:34:41 A.M.
Q Yep. Correct. And then it states "Added User," and under the "Added User" it says "rhoffman2"; is that correct?
A That's correct.
Q And I'm assuming, but correct me if I'm wrong, that rhoffman2 is you.
A That is one of the user names in Zoho for me, yes.
Q Okay. Wonderful. And then just scrolling over, it indicates -- under "Notes" --
A Uh-huh.
Q -- it looked like whatever issue had come up was fixed, and then under "Service Entry Type," it receives "Telemetrics." Did I receive that -- Did I read that correctly?
A "Telematics," yes.
Q "Telematics." I -- My apologies. I, very

unfortunately, know nothing about vehicles. It would help me very much in my life if I did, but, yeah.

So just going back down to Page 24 -- I apologize. I need to scroll. And then on the top of Page 24, it says "Status: Completed" and then "Issued By: Rodney Hoffman"; is that correct?

A Correct.

Q Okay. Am I understanding -- Would that mean that you had completed that job?

A That would be your understanding, yes. That -- Whatever that was for -- I would need to see it again, but that was a service call for that location -- for that van.

Q Okay. And then it says "Modified Time: 02-22-21, at 3:05:52 P.M." Did I read that correctly?

A You read the "Modified Time" correctly, but I do not recognize the "Modified User."

Q Okay. What does "Modified Time" mean?

A I don't know.

Q Okay. Have you ever seen a document like this before?

A No.

Q Okay. Did this -- Were you required to record your work in the Zoho system like this?

A Were they what, please?

Q Were you required to record your work in the Zoho system like this?
A What work?
Q The work you performed on telematics, inspections, plates, et cetera.
A In this particular case that you're outlining, the issue is a "Telematics - Non reporting device," and then it says "Fixed" February 16th, 9:07 A.M. That would be the time stamp on the form that I filled out to say that I fixed the telematics regardless of how long it took me to fix them.
Q Okay. Understood. But you would agree with me that this -- this time that you -- is on this form -- you know, that the elapsed time between the (inaudible) time and the fixed time --
THE REPORTER: I'm sorry. The -- Hold on.
Q (BY MS. PAGE) You would agree with me that the time that had elapsed between the time on the form and the fixed time would have been greater than the time of -- that it actually took you to fix them; correct?
A No, I don't agree with that.
Q Well, if you fixed a vehicle and then you had to write it on the form after you fixed the vehicle, wouldn't that time be later than the time that you actually fixed it?

A If you're asking me on the -- Under the "Select Issues" column, where it says "Fixed - 02/16/21," at 9:07:02 A.M., that would be the time stamp of the form that says that I fixed the telematics. That is all that it would say.
Q Okay.
A It would be after or it may be before. It just depends on the job.
Q Okay. So even though it says "9:07:02 A.M.," that does not necessarily mean that you fixed the issue prior to 9:07:02 A.M.?
A I may have fixed the issue prior to 9:07, or I may have fixed the issue during the time stamp of the form, or I may have filled the form out and fixed the issue after the time stamp of the form. It's simply a time stamp saying that that is the time I filled out the form. That's all that that is.
Q Okay. Understood. Okay. So this is --
A Excuse me -- Excuse me a second, please.
Q No problem. I do apologize. This is going out of order slightly.
A May I have -- May I have permission to get a bottle of water? It's not a break. I just need to get a bottle of water, please.
Q Of course. I'm going to try to fix this to go

back in order, so --
A Okay. Thank you.
(Discussion held off the record)
(Exhibit No. 4 marked)
Q (BY MS. PAGE) Okay. So this will be, again, very brief. Mr. Hoffman, are you able to see this document that I'm currently sharing?
A Yes.
Q Okay. And we only need to look at Page 1. It's, basically, kind of self-explanatory, and I'll represent that this was actually produced by your counsel at the deposition of our representative. We're going to mark it Fluid 4, and it's currently a part of Mr. Amigoni's dep, and it is Exhibit 8.
So just to go through, it says "Year" -- or it says "y2020w08," and then to the left of that -- or to the right of that, rather, it says "22:24," and then it says "SUM of Hours:Min:Second." Have you ever seen this document before, Mr. Hoffman?
A Not during the course of my employment.
Q When have you seen it?
MR. WELMAKER: Erika, I want to make it clear that I did not create this document. I produced it after you guys produced it to me. I just want to clarify that.

MS. PAGE: Understood. Thank you.

Q (BY MS. PAGE) When did you see this particular document, Mr. Hoffman?

A This -- this attachment was emailed to me by my lawyer.

Q Okay. And do you have an understanding as to what this document is?

A I have no understanding of what it is.

Q If I were to represent to you that it included the hours that you logged in Zoho for parts of 2020, would that refresh your recollection?

A I have no recollection of it, so I don't know that it would refresh anything. I also don't know that it's hours. I believe at the top it says "minutes" and "seconds."

Q Okay. Would it appear accurate to you that you spent approximately, though, that amount of hours, minutes, and seconds performing a specific job?

A If I can go to the y2020week -- or w -- I think that means week -- w08 and refer to the top, it says "SUM of Hours:Minutes:Seconds." If I'm reading that correctly, then I'm reading minutes and seconds for Week 8. If that is -- If that is what I'm reading, that -- none of this represents any of the work that I've done.

Q Okay. Understood. Moving on -- And, again, just two more documents.

(Exhibit No. 5 marked)

Q (BY MS. PAGE) Okay. Can you see this document, Mr. Hoffman?

A Yes. I see about -- probably three-quarters of it.

Q Okay. And it's just one page, so I will make it slightly smaller.

MS. PAGE: And, Doug, I will represent to you that this is a document produced by Fluid, Bates stamped 000213, and we ask that it be introduced as Fluid 5.

THE WITNESS: It's hard to read, but I -- I think it looks like a list of some employees.

Q (BY MS. PAGE) Okay. Understood. And, Mr. Hoffman, I'll represent to you that this is -- this lists the Fluid employees who were also working in Texas as Lieutenants during your tenure at the company, and the redacted people are the people who worked as Lieutenants outside of Texas.

I'm just going to briefly go through each of the people listed. I'm just going to ask whether you know them and whether you've spoken with them since you filed this lawsuit. So brief "yes" or "no" responses.

Do you understand?
A I need clarification on "spoken to them" because I dealt with them every day in the term of my employment.
Q Spoken to them regarding this present lawsuit.
A Okay.
Q Brandon -- or, yeah, Braden Tozer?
A No.
Q Josey Cole?
A Josey Cole? To my knowledge, no. I don't -- I don't recognize the name, no.
Q Understood. Scott Lee?
A I stated before, yes.
Q And you spoke with Mr. Lee regarding this lawsuit; correct?
A Yes, to the extent that I stated there was a lawsuit.
Q Okay. Understood. Joey Sena?
A No. I don't know who that is.
Q Donald Lee?
A No.
Q Richard Freeman?
A No.
Q Chelcia Johnson?
A No.

Q And Tori Seif-Matsick?
A No.
Q Okay. And just kind of going through, you say your -- your testimony before was that you worked zero overtime hours; correct? It says "Year-To-Date OT Hours" and it states "0" on the bottom?
A No, that's not my testimony.
Q Okay. But your testimony was that you worked zero overtime hours since the conversion to hourly employees; correct?
A No. That's also not my testimony.
Q What was your testimony since the conversion?
A My testimony was that on March 3rd a meeting was held that said we were going to hours immediately, that the first four -- full week of employment on Monday, March 8th, I worked 11.1 hours and, also, 51.1 hours for the week, that I advised my Fleet Manager, J.D. Spiller, of the discrepancy because Zoho did not record my time, that he said, "Yes, sir," that after the end of the week, when I did not see that the hours were done, I emailed Tiffany. I explained to her about this, and Tiffany sent an email back stating that I'm not on hourly. I'm on salary. That is what I testified to.
Q Okay. Understood. Just scrolling down -- and

I'm not asking you whether this is correct, from your recollection, or not. I'm just asking you that this -- to clarify this is what it says. This bottom left-hand corner of the document, and I will -- I will enlarge it, it says "OT Since Conversion" at the bottom left-hand corner. Did I read that correctly?
A Yes, I see that.
Q Okay. I'm just going to kind of go through these individual salaries. "Braden Tozer, Annual Salary: $37,500." Did I read that correctly?
A Yes, you read that correctly.
Q "Josey Cole: $40,000"; is that correct?
A Correct.
Q "Scott Lee: $35,000"; is that correct?
A Correct.
Q "Donald Lee: $35,000"; is that correct?
A Yes.
Q "Richard Freeman: $35,568"; is that correct?
A Yes.
Q "Chelcia Johnson," again, "$35,568"; correct?
A Yes.
Q And then "Tori Seif-Matsick: $17.00 an hour"; correct?
A Correct.
Q Okay. Just one more document, Mr. Hoffman.

Thank you for bearing with us.

(Exhibit No. 6 marked)

Q (BY MS. PAGE) All right. Can you see this document?

MS. PAGE: And I'll represent, Doug, it's Bates stamped Hoffman 0050.

THE WITNESS: Yes.

Q (BY MS. PAGE) Okay. And, Mr. Hoffman, if you go to the bottom, it looks like on Tuesday, April 6, at 6:13 A.M., you emailed Tiffany Lee, and you stated, "Tiffany, I'm sorry to bother you but I have one more question. When I was on salary was my employment considered exempt or non-exempt? Now that I'm on hourly am I considered exempt or non-exempt? Thanks, Rod." Did I read that correctly?

A Correct.

Q And then Tiffany replies, "Exempt means exempt from OT so as a salaried employee you would be considered exempt. You are now non-exempt meaning eligible for OT." Did I read that correctly?

A Yes.

Q To which you respond, "Thank you"?

A What's that?

Q To which you then respond, "Thank you"?

A Yes.

MS. PAGE: Okay. Mr. Hoffman, I thank you for your time. I have no further questions, so you're free to go unless your attorney has any follow-up questions.

MR. WELMAKER: Yeah. I just -- I just want to ask a couple of follow-up questions.

EXAMINATION

Q (BY MR. WELMAKER) Mr. Hoffman, prior to March 17th, 2021, would someone be able to reconstruct your time by looking only at data contained in Zoho?

A Absolutely not.

MS. PAGE: Objection to form.

Q (BY MR. WELMAKER) Why -- why not?

A Why wouldn't they be able to?

Q Correct.

A Because from the time of my employment in February to the time of March 17th, several changes were made to Zoho. Some of those changes were made to add forms to accommodate some of the work that I did, and some of those forms that were added, were added based upon my discussions with Leo about forms that needed to be added and, also, other Lieutenants' discussions.

Also, anything outside of Zoho could be done -- I mentioned delivering vans, but I also mentioned emergency service calls. If a service call

didn't involve creating an issue in Zoho or issuing a service in Zoho, it would never have been noted.

Also, anything that had to be done outside of Zoho but still had to be done to support the company, Cliq messages, Slack messages, emails, telephone calls, automatic messages that come through where -- I mentioned those that -- telematics down or the battery down. As an example of that might be after December -- at the end of December 2020, we had several vans that were off rental. I think the total count was between 40 and 50, and they were just sitting at different lots, and the batteries would run down.

And so I would get bombarded with all these messages that batteries are low, and I'd have to, of course, go out and get them started, and none of them involved changing out a battery. It wasn't a problem with that. The problem was with the batteries themselves. There are AGM batteries in Chrysler products, and if there -- if a Chrysler product isn't constantly running, they're just going to drain from the telematics draining them.

So there was a period of time from late December 2020 to, gosh, into March where there were vans going dead that I just had to go out and start them, and that's all that I needed to do, and my whole morning

could be spent starting 20 vans, and I would have never touched Zoho to do it.

Air -- An air-conditioning issue happened one day, where I had to go out at 7:00 at night and meet the van. It didn't require a service. The driver just didn't turn on the button that allows the air-conditioning to be done, so I flipped the button and said, "Thank you very much," and went on my merry way. That's how it worked in my company.

Or a flat tire. When I was the tire vendor, if I didn't have to fix the tire right away or I could put a brand new tire that I happened to have at the shop on it, then it wasn't necessarily required to enter a form if I could go and get that flat tire fixed and bring it back and put it on. It would create an expense report, and I would have to do an expense report, but I might not necessarily have to do a form.

Fixing telematics. Most of the time when a telematics was down or we got that reward, no Zoho form was needed. If I didn't have to change the telematics box, nothing had to be filled out.

On almost every job in Zoho, which I've been saying the whole time since I've been here today, the only thing that Zoho kept was a time stamp of when the form was actually filled out. If I went to a

location and needed to inspect six vans at -- between 3:00 and 5:00 in the morning and they were all together, I could do all six inspections and then open Zoho at the end of all of the inspections and fill out all the forms.

As a matter of fact, early in my career, Jen Gray asked me -- held a meeting and asked, "How do you do an inspection in four minutes?" I said, "What do you mean 'in four minutes'?" She said, "Well, I'm looking at your time stamps in Zoho, and from one to the next is only four or five minutes." And I said, "Yeah, because I'm filling out the forms. I've already done the inspections. They're all done," and then she understood. And I did that all through my career, all the way up till I quit. That's the way that I would work because that was the most efficient for me.

So in answering service calls and moving vans and dealing with my Sales Manager and dealing with all the communications during the day, reviews in the morning, reviews in the afternoon, travel time, all of those things, nothing is in Zoho for that. Some of them are now, like, for example, moving vans. Moving vans are in Zoho now --

MS. PAGE: I --

THE REPORTER: Hold on.

THE WITNESS: -- because it was a suggestion of the form.

MS. PAGE: I do apologize for interrupting you, but I do think this is all information that you've already testified to, but thank you for elaborating.

Q (BY MR. WELMAKER) You can continue.

A Okay. And then --

MS. PAGE: I object to the form. It's a narrative testimony.

MR. WELMAKER: That's fine.

(Simultaneous cross-talk)

(Reporter clarification)

MS. PAGE: Object to the form. It's a narrative testimony. It's already been testified to extensively.

Q (BY MR. WELMAKER) Mr. Hoffman, what other things would not be contained in Zoho that would not -- that would not reflect your time?

A Anything accomplished in Zoho on one of my vehicles by a vendor, unless an expense was created or I personally entered the service, could have been entered by the vendor even though I was on site watching it be done.

An oil change vendor never had -- they were not allowed to have keys to the vehicles. Our

renters would not leave keys in the vehicle for us, so I would have to meet my oil vendor on site and provide him keys so he could start the vans after he did the oil change.

My tire vendor, when they finally had a tire vendor on, which was, I believe, September of 2020 -- I'd been doing them up till then. He very rarely -- or no time do I remember him ever agreeing to work on a weekend, but when he did change tires, I would -- I would sometimes have to go out and unlock vans. Now, I say "sometimes" on the tire vendor because sometimes, at some yards, they were secure and they were unlocked already, so it might not be all the time.

Q So let me stop you there. So would you agree with me that Zoho's not going to capture an accurate representation of your time prior to March 17th, 2021?

A Yes. Until the clock-in and clock-out feature was added to Zoho and fixed, Zoho could not capture an accurate representation. As I've testified during this whole time, it's only a time stamp of when a form was filled out. That's all Zoho is.

Q If -- if Defendant really, truly wanted to try to reconstruct your time, what sort of documents would they need to look at and provide to us?

MS. PAGE: Objection. I think this is

something that Mr. Hoffman doesn't necessarily have authority on. I think that's something that our company would.

Q (BY MR. WELMAKER) Based on your experience, Mr. Hoffman, based on your real-life experience working with documents and applications at Defendant, what sort of documents would you want to have in order to accurately reconstruct your time prior to March 17th, 2021?

A I would have to have all time stamps in Zoho. What I was shown as exhibits was not all the time stamps in Zoho. It was service calls and issues, what I was shown. I would have to have every Zoho time stamp, including expenses and onboarding, the plate form, the lettering form, the key inventory, the tire form, the inspection form. I would need all the forms to see the time stamps.

Then I would need -- I guess I would need all emails from all company employees who emailed me to show what time, at least, that they emailed or I responded. Slack and Cliq messages, man, those are -- I can't even put a number -- in the thousands, I would imagine, of messages flying back and forth seven days a week between interested parties. Every time in Slack or Cliq, a message would automatically generate about

telematics or batteries, even though I may not have to fill out a form to fix them, but I still had to go out there and fix them.

Plates were 24-hour rule, so I'd need that. Oh, gosh. We had monthly meetings on Google, on Cliq, on Slack. I'd need to know those times. My van -- I had three vans that I used for work. They had telematics in them, but they had -- sometimes -- sometimes we changed the boxes. Sometimes we tested them. Sometimes they weren't working, but you could get part of the picture from my van telematics.

Any transactions for credit cards, the business credit cards that I was provided, those would show every time I was in a store, at a vendor. Anything that I paid for with a credit card would show. And then if you add -- even if you added all that up, then there's the untold hours that I worked reviewing everything in the morning, finishing in the evening, the travel time. Again, moving the vans, dealing with my Sales Manager, dealing with Leo, dealing with Jen, dealing with J.D. These are all things that happen outside of Zoho.

So in my opinion, Doug, the -- the -- the truth of the matter is, is that this was a start-up company. This is what we did to make it work. My

market was one of the best. My vans were complimented. My customers called in and complimented me. Everything was done to make this work, and those are the things that you would need, I would think, and probably some more, to accurately recreate time.

MR. WELMAKER: I have no further questions.

EXAMINATION

Q (BY MS. PAGE) A few follow-ups, and, Mr. Hoffman, you don't need a long answer, just as brief as you can be.

MR. WELMAKER: Erika, I'm having a hard time hearing you.

THE WITNESS: Me, too.

(Discussion held off the record)

Q (BY MS. PAGE) Mr. Hoffman, I know you mentioned you performed numerous services that weren't recorded. If these services were not recorded, how did Fluid know when and how much to pay the customers that you provided services to?

A Okay. Let me give you an example of a couple of services that that wouldn't make a difference. When a van was turned over, it was -- it was told to me by Jennifer, J.D., and also my Sales Manager if it wasn't overly dirty, meaning mud and caked crusted on it, that

I did not need to enter a service for that, just clean it and turn it over. That's something.

I cited the air-conditioning example. I went out and stood in the parking lot. The driver pulled in and I clicked the button. That's it.

Q And would your time be recorded for those activities?

A No. No.

Q Okay. Understood. What about those expense reports that you testified to? Would they include the hours that you worked?

A No. They -- Under Zoho -- Any expenses that I entered in Zoho would have a time stamp. That's what I was referring to.

Q Expense report -- You were not referring to expense reports or invoices, for example, that you were sending to any of your clients?

A Invoices were take -- A picture of the invoice was taken and entered in Zoho.

Q Would hours that you worked for a particular client be included on those invoices?

A No.

MS. PAGE: Okay. That's all further questions -- or I have no further questions.

MR. WELMAKER: All right. We'll reserve

our questions until the time of trial.

MS. PAGE: Likewise.

(DEPOSITION CONCLUDED AT 2:35 P.M.)

CHANGES AND SIGNATURE

RE: Civil Action No. 5:21-CV-423-XR

RODNEY HOFFMAN, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED, PLAINTIFF
v.
FLUID FLEET SERVICES, LLC, DEFENDANT

The following are corrections to the transcript of my ORAL DEPOSITION taken on the 2nd day of August, 2022, in the above-referenced cause:

| PAGE | LINE | CORRECTION AND REASON |
|---|---|---|
| ______ | ______ | ______ |
| ______ | ______ | ______ |
| ______ | ______ | ______ |
| ______ | ______ | ______ |
| ______ | ______ | ______ |
| ______ | ______ | ______ |
| ______ | ______ | ______ |
| ______ | ______ | ______ |
| ______ | ______ | ______ |
| ______ | ______ | ______ |
| ______ | ______ | ______ |
| ______ | ______ | ______ |
| ______ | ______ | ______ |
| ______ | ______ | ______ |

IF YOU DO NOT WISH TO MAKE ANY CHANGES, PLEASE NOTE "NONE" ABOVE.

______________________________
RODNEY HOFFMAN

THE STATE OF TEXAS )
COUNTY OF BEXAR )

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned Witness, RODNEY HOFFMAN, on this the _______ day of _______________, 2022.

______________________________
Notary Public in and for the State of Texas

My commission expires: ______________________

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

RODNEY HOFFMAN, ON BEHALF *
OF HIMSELF AND ALL OTHERS *
SIMILARLY SITUATED, *
PLAINTIFF *
v. * CA 5:21-CV-423-XR
FLUID FLEET SERVICES, LLC, *
DEFENDANT *

-------------------------------------------------------

REPORTER'S CERTIFICATE FROM THE

ORAL DEPOSITION OF RODNEY HOFFMAN

AUGUST 2, 2022

-------------------------------------------------------

I, SHERRI K. WILLIAMSON, a Certified Shorthand Reporter in and for the State of Texas, do hereby certify that the foregoing deposition is a full, true, and correct transcript;

That the witness, RODNEY HOFFMAN, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the Witness;

That the deposition transcript was submitted on               , 2022, to the witness or to the attorney for the witness for examination, signature, and returned to me by               , 2022;

That the amount of time used by each party at the deposition is as follows:

ERIKA M. PAGE - (2 hours, 58 minutes)

DOUGLAS B. WELMAKER - (9 minutes)

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

DOUGLAS B. WELMAKER, Attorney for Plaintiff;

ERIKA M. PAGE, Attorney for Defendant;

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

WITNESS MY HAND, this the day of ,
A.D., 2022.

SHERRI K. WILLIAMSON, TX CSR #5105
Expiration Date: 7-31-2023
Magna Legal Services
Firm Registration No. 633
1635 Market Street, 8th Floor
Philadelphia, PA 19103
866-624-6221

FURTHER CERTIFICATION

The original deposition transcript with corrections ( ) was ( ) was not returned pursuant to the Federal Rules, and the ( ) original transcript ( ) copy of the nonsignature certificate to be attached to the attorney's copy of the deposition was hand-delivered to the custodial attorney, ERIKA M. PAGE, for safekeeping and use at trial.

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

That $__________is the deposition officer's charges to ERIKA M. PAGE for preparing the original transcript and any copies of exhibits;

That the deposition was delivered in accordance with the Federal Rules of Civil Procedure, and that a copy of this certificate was served on all parties shown herein.

Certified to by me this _____ day of ____________, 2022.

______________________________
SHERRI K. WILLIAMSON, TX CSR #5105
Expiration Date: 7-31-2022
Magna Legal Services
Firm Registration No. 633
1635 Market Street, 8th Floor
Philadelphia, PA 19103
866-624-6221

ORIGINAL NOT VALID UNLESS SIGNED BY REPORTER